UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | ) <br> ) <br> ) |
| v. | ) No. 1:22-cr-00023-LEW <br> ) |
| **DAQUAN CORBETT**, | ) <br> ) |
| Defendant | ) |

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

The matter before the Court is Defendant Daquan Corbett's Motion to Suppress (ECF No. 591). Corbett argues that his Fourth Amendment rights were violated when a police officer stopped his vehicle and later searched it.

A hearing on Corbett's motion, with testimony from Officer Daniel Benvie, who made the stop, was held on December 11 and 12, 2023.[1] For the reasons below, Corbett's motion to suppress is DENIED.

### BACKGROUND

Corbett is one of seventeen individuals indicted by a federal grand jury in February 2022 for his alleged role in conspiring to distribute controlled substances.[2] Corbett now moves to suppress all evidence stemming from a vehicle stop on March 11, 2021.

---

[1] The hearing was held in conjunction with Corbett's other motions to suppress as well as those filed by co-defendants Daviston Jackson and James Valiante.

[2] All seventeen individuals were indicted for conspiring to distribute and possess with the intent to distribute 50 grams or more of methamphetamine, 500 grams or more of a mixture or substance containing methamphetamine, and 400 grams or more of a mixture or substance containing fentanyl. 21 U.S.C. § 846; *id.* §§ 841(a)(1), (b)(1)(A)(vi), (viii).

1

Around 9:10 p.m. that night, Officer Daniel Benvie of the Brockton, Massachusetts, Police Department was patrolling around Pleasant Street in Brockton, a high-crime area. He observed a white Dodge Durango with tinted windows back into a parking lot at 47 Pleasant Street. The Durango then drove through an intersection as the light was changing from yellow to red. Thus, Officer Benvie activated his emergency lights and siren, and he stopped the vehicle. He approached the Durango, and asked the driver, Daquan Corbett, for his license and registration. Corbett provided his license, but he could not find the vehicle's rental agreement. Corbett said he believed that the rental company had emailed him the agreement. Officer Benvie observed that Corbett was nervous as his voice was trembling and his hands were shaking. Officer Benvie provided dispatch with information about the vehicle, and he requested backup based on Corbett's nervousness. Dispatch advised Officer Benvie that the Durango's registration had expired and that Corbett's Board of Probation records included firearm- and drug-related offenses.

After more officers arrived, Officer Benvie told Corbett that the vehicle's registration was expired and that it would be towed. Thus, Officer Benvie told Corbett to exit the vehicle. Corbett asked to get his belongings, prompting Officer Benvie to ask what he wanted from the car. Corbett did not respond, so Officer Benvie searched the vehicle for personal belongings, like a wallet, that Corbett might have wanted. In the Durango's center console, Officer Benvie found a wallet with a large amount of cash as well as several packages of marijuana. Officer Benvie then noticed that the armrest control panel on the driver's side was out of place. He lifted it up, and found a firearm concealed under the

2

control panel. Officer Benvie informed the other officers about this, and Corbett was placed in handcuffs. Afterwards, the officers searched the vehicle and found narcotics.

Corbett moves for suppression of all items seized during the stop as well as the officers' observations; statements by Corbett; and any additional facts or information obtained by the police during the stop as fruits of the poisonous tree. He argues that suppression is appropriate because his Fourth Amendment rights were violated when Officer Benvie stopped his vehicle. Alternatively, Corbett claims that the officers' conduct exceeded the permissible scope. Lastly, Corbett contends that the warrantless searches of the Durango were unconstitutional.[3] The Government maintains that Officer Benvie had reasonable suspicion to stop the Durango after he witnessed a traffic violation. The Government contends that any expansion in the scope of the stop was supported by reasonable suspicion developed during the stop. The Government categorizes Officer Benvie's initial search of the Durango for Corbett's personal belongings as a protective "frisk" and claims that the subsequent vehicle search was supported by probable cause. In the alternative, the Government argues that suppression is inappropriate because the vehicle would have been inevitably searched since it was going to be towed.

## DISCUSSION

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. This right "extend[s] to brief investigatory stops of persons or vehicles

---

[3] Based on these facts, Corbett is facing criminal charges in the Commonwealth of Massachusetts, and he presented similar arguments in a motion to suppress before the Brockton Superior Court. The Government's exhibits contain transcripts of the suppression hearing as well as Justice Davis's decision denying Corbett's motion.

3

that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "A traffic stop constitutes a seizure of 'everyone in the vehicle' for purposes of the Fourth Amendment and thus must be supported by reasonable suspicion that a traffic violation has occurred." *United States v. Chaney*, 584 F.3d 20, 24 (1st Cir. 2009) (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007)). The "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Therefore, "[a]uthority for [a traffic stop] thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). "In carrying out the seizure's 'mission,' an officer is also permitted to undertake those 'ordinary inquiries incident to [the traffic] stop," which include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *United States v. Clark*, 879 F.3d 1, 4 (1st Cir. 2018) (alteration in original) (quoting *Rodriguez*, 575 U.S. at 355). "[W]hile an officer's actions must bear some relation to the purpose of the original stop, officers may shift their "focus and increase the scope of" the "investigation by degrees if" their "suspicions mount during the course of the detention." *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001).

    Under the automobile exception, officers can "search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband." *United States v. Silva*, 742 F.3d 1, 7 (1st Cir. 2007). Probable cause exists

4

when "the facts and circumstances as to which the police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found." *Robinson v. Cook*, 706 F.3d 25, 32 (1st Cir. 2013). The officers must have had probable cause "at the time that they searched the car." *United States v. Goldman*, 41 F.3d 785, 787 (1st Cir. 1994). The Government has the burden of establishing the automobile exception. *United States v. Lopez*, 380 F.3d 538, 543 (1st Cir. 2004).

"[E]vidence derived from unlawful searches is generally subject to suppression." *United States v. Scott*, 270 F.3d 30, 42 (1st Cir. 2001). However, under the inevitable discovery rule, "the exclusionary rule does not bar the use of unlawfully obtained evidence in 'any case in which the prosecution can show by a preponderance of the evidence that the government would have discovered the challenged evidence even had the constitutional violation to which the defendant objects never occurred.'" *United States v. Cordero-Rosario*, 786 F.3d 64, 73 (1st Cir. 2015) (quoting *Scott*, 270 F.3d at 42); *see Nix v. Williams*, 467 U.S. 431, 440–48 (1984). The First Circuit instructs that there are three questions in evaluating whether the inevitable discovery exception applies.

> [F]irst, whether the legal means by which the evidence would have been discovered was truly independent; second, whether the use of the legal means would have inevitably led to the discovery of the evidence; and third, whether applying the inevitable discovery rule would either provide an incentive for police misconduct or significantly weaken constitutional protections.

*United States v. Fagan*, 71 F.4th 12, 23 (1st Cir. 2023) (alteration in original) (quoting *United States v. Almeida*, 434 F.3d 25, 28 (1st Cir. 2006)). A "warrantless [vehicle] search is permitted under the Fourth Amendment if it is carried out pursuant to a standardized

5

inventory policy." *United States v. Hawkins*, 279 F.3d 83, 86 (1st Cir. 2002) (citing *Illinois v. Lafayette*, 462 U.S. 640, 647–48 (1983)). Thus, even if officers search a vehicle without probable cause, suppression is inappropriate if the Government can demonstrate that the vehicle would have later been searched pursuant to a standardized inventory policy. *See United States v. Zapata*, 18 F.3d 971 (1st Cir. 1994) (explaining that because "the car containing the contraband was unregistered and uninsured," it "could not lawfully be driven on a public highway," so "police surely would have impounded it and, in accordance with standard practice, conducted a routine inventory search").

### A. The Vehicle Stop

The parties disagree about whether there was reasonable suspicion to stop the Durango for a traffic infraction. Having reviewed the footage provided by the Government, I conclude that there was reasonable suspicion to stop the Durango for violating 720 Code Mass. Regs. § 9.06(10)(c), which requires that "any driver approaching the intersection or a marked stop line shall stop at such point unless so close to the intersection that a stop cannot be made in safety." When the traffic light turned yellow at 9:13:24.360 p.m., the Durango was about five-car lengths from the intersection's stop line.[4] Another vehicle was well over five-car lengths behind the Durango, so the Durango could have safely stopped at the intersection, as required by Massachusetts law. But instead of slowing down and stopping, the Durango continued, and entered the intersection at about 9:13:25.935 p.m. After the traffic light turned red at 9:13:28.360 p.m., the Durango was still in the

---

[4] Govt's Ex. B-1 00058055 (Pleasant St. (East)).

intersection.[5]  Having observed this traffic violation, Officer Benvie had reasonable suspicion to stop the Durango.  *See Chaney*, 584 F.3d at 24.

### B.  The Scope of Police Conduct

The parties further disagree as to whether the scope of police conduct during the stop impermissibly expanded.  I agree with the Government that the officers' conduct did not exceed the permissible scope.

After observing the traffic infraction, Officer Benvie initiated the stop, spoke with Corbett, and asked for his license and registration.  These "ordinary inquiries incident" to a traffic stop are permissible.  *See Clark*, 879 F.3d at 4.  After inquiring about the Durango's registration, Corbett was unable to produce a rental agreement.  Thus, Officer Benvie provided information about the Durango to dispatch, who told Officer Benvie that the vehicle's registration was expired.  Having learned this, the permissible scope of police conduct expanded because the Durango could not legally be operated.  *See* Mass. Gen. Laws Ann. ch. 90, § 9 ("No person shall operate . . . any motor vehicle . . . unless such vehicle is registered . . . .").  Thus, Officer Benvie acted reasonably by having Corbett exit the vehicle so that it could be towed and subjected to an inventory search.[6]  *See Chhien*,

---

[5] Govt's Ex. B-1 00058057 (Warren Ave. (North at Pleasant St.)).

[6] At the suppression hearing, the Government admitted a copy of the Brockton Police Department's Motor Vehicle Search and Inventory Policy over Corbett's objection.  *See* Gov't's Ex. B-8.  Corbett argued that it was inadmissible because the policy did not have a date and because Officer Benvie was unable to explain when it was adopted.  I concluded that the policy was admissible.  The Federal Rules of Evidence generally do not apply in suppression hearings, and Corbett failed to make a showing that the policy was so unreliable such that it was inadmissible.  *See United States v. Schaefer*, 87 F.3d 562, 570 (1st Cir. 1996).

266 F.3d at 6 (explaining that the scope of police conduct may expand upon learning new information during a stop); see also Gov't's Ex. B-7 (towing policy).

## C. The Vehicle Searches

Corbett argues that Officer Benvie's initial search of the vehicle for Corbett's personal belongings, in which Officer Benvie found Corbett's wallet, with a lot of cash, as well as marijuana, was unconstitutional because there was not probable cause. Corbett also argues that the subsequent extensive search of the Durango lacked probable cause. The Government defends the validity of both searches. The Government characterizes Officer Benvie's initial search for personal belongings as a "frisk," and the Government argues that this was a reasonable measure taken to protect the officers. Next, the Government argues that the extensive search of the Durango was supported by probable cause given the totality of the circumstances after Officer Benvie found the wallet, cash, and marijuana. Alternatively, the Government argues that even if both searches were unconstitutional, suppression is inappropriate because the vehicle would have been searched anyways pursuant to a routine inventory policy.

It is unnecessary to decide whether the initial search for personal belongings and the subsequent extensive search were constitutional. Even if those searches were invalid, the Government has met its burden of establishing that the vehicle would have been inevitably searched pursuant to a standardized inventory policy.[7] An inventory search of the Durango

---

[7] Because there was no violation of the Fourth Amendment, suppression of observations by law enforcement and Corbett's statements is inappropriate.

would have been independent of the two challenged searches because Officer Benvie already decided to tow the vehicle, so it would have been searched. *See* Gov't's Ex. B-7 ("It shall be the policy of the Brockton Police Department to conduct an inventory search of all motor vehicles towed to the Brockton Police Station."); *see also Zapata*, 18 F.3d at 978 (holding that the inevitable discovery rule applied when a vehicle was "unregistered and uninsured" because "the state police surely would have impounded it and, in accordance with standard practice, conducted a routine inventory search"). An inventory search would have been legal, and it would have resulted in the officers inevitably discovering everything in the vehicle.[8] Lastly, there is no reason to believe that applying the inevitable discovery rule would incentivize police misconduct or significantly weaken constitutional protections.

## CONCLUSION

For the foregoing reasons, Corbett's Motion to Suppress (ECF No. 591) is **DENIED**.

Dated this 12th day of January, 2024.

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE

---

[8] At the hearing, Corbett argued that because the officers did not have a copy of the inventory policy with them, the officers would have searched the vehicle with unfiltered discretion. I disagree and find that the Government met its burden in establishing that the officers would have adhered to the standardized criteria and procedures, which were properly "designed to produce an inventory." *See Florida v. Wells*, 495 U.S. 1, 4 (1990); Gov't's Ex. B-8 (the inventory policy).