UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **DAQUAN CORBETT** | ) Nos. 1:22-cr-00023-LEW-1 | |
| | )        1:22-cr-00023-LEW-2 | |
| **DAVISTON JACKSON**, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTIONS TO SUPPRESS AND MOTION FOR A CONFERENCE OF COUNSEL, OR ORAL ARGUMENT ON MOTIONS TO SUPPRESS**

Before the Court are Daquan Corbett and Daviston Jackson's (collectively "Defendants") motions to suppress.  Mot. to Suppress, ECF No. 592 (Corbett); Mot. to Suppress, ECF No. 595 (Jackson).  In their motions, the Defendants request suppression of evidence from a traffic stop.

A hearing on these motions, with testimony from Drug Enforcement Administration ("DEA") Special Agent Bryan Klutzaritz and Maine State Police Sergeant Adam Schmidt was held on December 11 and 12, 2023.[1]  After the hearing, Defendants filed a joint motion for a scheduling conference, or in the alternative, for oral argument on their motions to address Maine State Police Trooper Matthew Williams, who initiated the stop, but was unavailable to testify.  Joint Mot., ECF No. 683.

---

[1] The hearing was held in conjunction with Defendants' other motions to suppress as well as the motion to suppress filed by James Valiante.

For the reasons below, all three motions are DENIED.

## BACKGROUND

Corbett and Jackson are among the seventeen individuals indicted by a federal grand jury in February 2022 for allegedly conspiring to distribute controlled substances.[2]  They now move to suppress evidence from a traffic stop on September 12, 2020.  Based on the testimony and exhibits, I make the following findings of fact.

Before this stop, DEA was investigating Corbett and Jackson.  In May 2020, Agent Klutzaritz applied for a search warrant from this Court to collect communication content from a cellphone that he suspected Jackson used.  *See* Gov't's Ex. 1.  His affidavit explained that the Maine State Police seized methamphetamine from a Cooperating Defendant who said that it was for Jackson.  *Id.* at 6.  A woman identified Jackson as "Matti" and told Agent Klutzaritz that "Matti" sold narcotics from her apartment.  *Id.* at 7.  She also explained that "Matti" worked with "Chinx," and that the group was associated with Ronald Spencer's apartment in Bangor, Maine.  *Id.*  Later, Agent Klutzaritz reviewed text messages from a co-conspirator's cellphone, and he saw drug-related text messages with an individual who identified himself as "Matty."  *Id.* at 8.  Agent Klutzaritz obtained this search warrant, and he reviewed the cellphone's text messages, concluding that it was likely being used by "Matti" and "Chinx" to facilitate drug trafficking.  *See* Gov't's Ex. 2

---

[2] All seventeen individuals were indicted for conspiring to distribute and possess with the intent to distribute 50 grams or more of methamphetamine, 500 grams or more of a mixture or substance containing methamphetamine, and 400 grams or more of a mixture or substance containing fentanyl.  21 U.S.C. § 846; *id.* §§ 841(a)(1), (b)(1)(A)(vi), (viii).

at 9.  Next, Agent Klutzaritz applied for and obtained a search warrant permitting DEA to track the cellphone's location.  Gov't's Ex. 2 at 15.

In June 2020, Agent Klutzaritz obtained search warrants to recover text messages for two cellphones used by a co-conspirator.  Gov't's Ex. 3 at 8.  Having reviewed those messages, Agent Klutzaritz requested and obtained a search warrant to monitor the location of a cellphone associated with "Chinx."  *Id.* at 12.  On September 10, 2020, Agent Klutzaritz saw that the phone was traveling from Quincy, Massachusetts, to Bangor, Maine.  Gov't's Ex. 4 at 1.  Suspecting that the vehicle would go to Spencer's residence in Bangor, Agent Klutzaritz set up surveillance there, and he saw a 2020 Jeep Cherokee with Florida license plates park down the street.  *Id.*  The Jeep was rented by Corbett.  Two men exited the Jeep and entered the residence.  *Id.* at 2.  The next day, the cellphone traveled to Aroostook County, where Agent Klutzaritz suspected that "Chinx's" organization was supplying people with narcotics and potentially firearms in exchange for cash.   On September 12, the cellphone was moving south on I-95, toward Massachusetts.  Gov't's Ex. 5 at 1.  Agent Klutzaritz contacted the Maine State Police and asked them to execute a "walled-off" stop in which the Maine State Police would identify a traffic infraction as a pretext to stop the Jeep without compromising the integrity of the DEA's investigation.

At about 1:02 p.m., Trooper Williams saw the Jeep traveling south on I-95 in Saco, Maine.  Gov't's Ex. 7 at 0:36–0:40.  Trooper Williams pulled onto the highway to follow the Jeep.  He clocked the Jeep traveling at 75 miles per hour, five miles over the posted speed limit.  *Id.* at 1:02–1:07; Gov't's Ex. 6 at 1.  The Jeep passed vehicles in the left lane before making what Trooper Williams described as an unsafe lane change.  Gov't's Ex. 7

3

at 1:43–1:47.  Trooper Williams went behind the Jeep, activated his emergency lights, and stopped it.  *Id.* at 2:00–2:20.

Trooper Williams went to the Jeep's passenger side, and he saw two men inside.  *Id.* at 2:45.  Trooper Williams identified Jackson as the driver and Corbett as the passenger and explained that he stopped them for speeding and for making an unsafe lane change. *Id.* at 2:45-3:30.  Sergeant Schmidt arrived on the scene.  Trooper Williams asked Jackson to step out of the vehicle, and he complied.  *Id.* at 3:29–3:50.  Trooper Williams asked Jackson if he had any weapons, and Jackson said that he had a knife, which he allowed Trooper Williams to retrieve before Trooper Williams pat-frisked him.  *Id.* at 3:55–4:11. Sergeant Schmidt asked Corbett to step outside of the vehicle, and he pat-frisked Corbett for weapons.  *Id.* at 4:23–5:04.

Trooper Williams and Jackson entered the police cruiser, where Trooper Williams began processing their information.  Trooper Williams explained that he stopped Jackson for driving 75 miles per hour and making an unsafe lane change since he was too close to another vehicle.  *Id.* at 4:40–5:00.  Trooper Williams asked if the Jeep was a rental and if Jackson was authorized to drive it.  Jackson explained that his name was not on the rental agreement and that Corbett rented it.  *Id.* at 5:03–5:48.  Trooper Williams asked Jackson where they were coming from, and Jackson said that they went hiking yesterday, but he was not familiar with their whereabouts.  *Id.* at 6:08–8:30.  Jackson then explained that they were about an hour north of where they were pulled over and that Corbett would know where they went.  Trooper Williams and Jackson exited the vehicle, and Trooper Williams asked Corbett where they went hiking.  Corbett first said that he did not know where they

4

were coming from, but he later said that they were near Augusta and that their trip was two or three days long.  *Id.* at 8:42–8:55.

Sergeant Schmidt retrieved his K-9, Ibo, from his vehicle and brought him to the Jeep.  *Id.* at 9:45–11:18.  Ibo alerted on the Jeep's passenger side rear door within thirty seconds.  *Id.* at 11:48.  Trooper Williams explained that Ibo alerted, and the officers placed both men in handcuffs.  *Id.* at 12:15–13:00.  Trooper Williams searched the Jeep and found multiple bags of cash bundled together with different colored rubber bands.  Trooper Williams removed Jackson's handcuffs and read him his *Miranda* rights.  Gov't Ex. 9 at 3:10–4:20.  Jackson waived his rights and agreed to answer questions.  Jackson said that the money was not his, and that he did not know who it belonged to.  Trooper Williams asked Jackson where he worked, and Jackson said that he worked in construction, but that he was not currently working.  *Id.* at 4:25–6:45.  Sergeant Schmidt read Corbett his *Miranda* rights, and Corbett invoked his right to counsel.  The officers seized the cash, which was later determined to be $57,225.

**DISCUSSION**

Before turning to Defendants' motions to suppress, I first address the Defendants' joint motion for a conference of counsel, or in the alternative, for oral argument on their motions to suppress.  Joint Mot., ECF No. 683.  Trooper Williams was expected to testify at the suppression hearing, but shortly before the hearing, the Government learned that Trooper Williams was on leave for an indefinite period of time and thus unable to testify. The Government notified the Defendants' counsel shortly before the suppression hearing that Trooper Williams was not available to testify, and the Government instead called

Sergeant Schmidt as a witness. At the end of the hearing, Corbett and Jackson requested an opportunity to cross-examine Trooper Williams. I explained that I would permit the Defendants to cross-examine Trooper Williams if he was able to testify in the immediate future, but I was not inclined to leave these motions to suppress in limbo forever. I instructed the Government to follow up with the Maine State Police about Trooper Williams' availability and update the Court by December 27, 2023. If Trooper Williams was unable to testify in the immediate future, I explained that I would take the motions under advisement because I had enough information to rule on the motions without prejudicing the Defendants. On December 27, the Government filed its notice with the Court, explaining that it contacted the State of Maine Attorney General's Office and the Maine State Police about Trooper Williams' availability and that Trooper Williams remained unavailable for an indefinite period of time. *See* Gov't's Notice Regarding Witness Availability, ECF No. 681 at 2.

Two days later, Corbett and Jackson filed their joint motion. They argue that Trooper Williams is central to the stop's legality and that his report was admitted over their objections.[3] The Defendants also attack Trooper Williams' credibility by observing that his police report did not state the real reason why he noticed the Jeep. The Defendants request that the Court schedule a conference of counsel to establish a schedule for them to independently investigate Trooper Williams' location and availability and to request and brief remedies. Alternatively, they request that I schedule oral arguments on these two

---

[3] The Defendants also state that Trooper Williams' dashcam video, Gov't's Ex 7; Gov't's Ex. 9, was admitted over their objections. However, these exhibits were admitted without objection.

motions to suppress.  In response, the Government maintains that the Court has sufficient evidence, which was properly admitted, to rule on the motions.

In league with my previous remarks during the suppression hearing, I deny the Defendants' joint motion because I have sufficient evidence to decide the motions to suppress without prejudicing the Defendants.

Criminal defendants have "no presumptive right to an evidentiary hearing on a motion to suppress." *United States v. Cintron*, 724 F.3d 32, 36 (1st Cir. 2013) (citing *United States v. D'Andrea*, 648 F.3d 1, 5 (1st Cir. 2011)).  A hearing "is required only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record." *United States v. Francois*, 715 F.3d 21, 32 (1st Cir. 2013) (quoting *United States v. Staula*, 80 F.3d 596, 603 (1st Cir. 1996)).  The "defendant must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief." *Id.* (quoting *Staula*, 80 F.3d at 603).  During a suppression hearing, "apart from questions of privilege, the Federal Rules of Evidence do not apply." *United States v. Schaefer*, 87 F.3d 562, 570 (1st Cir. 1996) (citing *United States v. Matlock*, 415 U.S. 164, 172–74 (1974)).  Instead, "a judge presiding at a suppression hearing may receive and consider any relevant evidence, including affidavits and unsworn documents that bear indicia of reliability." *Id.*

There is sufficient evidence to decide these motions without testimony from Trooper Williams.  While the Defendants attempt to cast Trooper Williams' report as uncredible because he did not explain that he was instructed to stop the Jeep, I find that his report is sufficiently reliable.  Trooper Williams' report is consistent with his dashcam video,

perhaps the most reliable source of evidence of what happened during the stop, as well as Sergeant Schmidt's testimony.   To the extent that the Defendants contest Trooper Williams' proffered reasons for stopping the Jeep, namely for speeding and making an unsafe lane change, it is unnecessary to decide whether he had reasonable suspicion to stop the Jeep for these traffic infractions.   As explained below, I have sufficient evidence to find that the stop was legal because Agent Klutzaritz had reasonable suspicion to stop the Jeep and his "directive to stop" it was "thus sufficient to attribute" his reasonable suspicion to Trooper Williams.   *United States v. Balser*, 70 F.4th 613, 621 (1st Cir. 2023).[4]

Having denied Defendants' joint motion, I turn to the merits of their motions to suppress.   Corbett and Jackson argue that the stop was unconstitutional because it was invalid at its inception and because the officers' investigation exceeded its permissible scope and unlawfully prolonged the stop.   Jackson also moves for suppression of his pre-*Miranda* statements and requests suppression of the cash seized, claiming that the officers did not have probable cause to seize it.   I address each argument in turn.

## A.  The Vehicle Stop

---

[4] Insofar as the Defendants suggest that Trooper Williams' report and dashcam footage should be stricken from the record because he is unavailable, they are mistaken.  Such a remedy is improper for a suppression hearing, where the Sixth Amendment right to confront witnesses has not attached.  *See United States v. Mitchell-Hunter*, 663 F.3d 45, 51–53 (1st Cir. 2011); *see also McCray v. Illinois*, 386 U.S. 300, 313–14 (1967) (holding that the government's failure to produce an informant at a suppression hearing did not unconstitutionally deprive the defendant of his Sixth Amendment right to confrontation and cross-examination).  I also note that the Defendants offered some of Trooper Williams' text messages into evidence, though they express no concern about these exhibits.  *See* Def.'s Ex. 1 (text messages between Agent Klutzaritz and Maine State Troopers); Def.'s Ex. 2 (text messages between Agent Klutzaritz and Trooper Williams).

The Defendants mount two challenges against the stop's validity. First, they argue that the stop was invalid at its inception because Trooper Williams did not have reasonable suspicion to believe that the Defendants violated a traffic regulation. Second, the Defendants argue that the officers' investigation exceeded its permissible scope and unlawfully extended the stop's duration. The Government defends the stop's validity on the grounds that Jackson violated traffic laws by speeding and making an unsafe lane change. Alternatively, the Government argues that the stop was legal based on Agent Klutzaritz instructing the Maine State Police to stop the Jeep. The Government also defends the officers' investigation as reasonable.

The Fourth Amendment of the Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. This right "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "A traffic stop constitutes a seizure of 'everyone in the vehicle'" and "thus must be supported by reasonable suspicion that a traffic violation has occurred," *United States v. Chaney*, 584 F.3d 20, 24 (1st Cir. 2009) (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007)), or "reasonable, articulable suspicion of an individual's involvement in some criminal activity." *United States v. Dion*, 859 F.3d 114, 124 (1st Cir. 2017) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

During a lawful traffic stop, a police officer may "require the driver of a car . . . to step out of his vehicle." *United States v. Coplin*, 463 F.3d 96, 102 (1st Cir. 2006); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 111 & n.6 (1977) (per curiam). A "pat-frisk may accompany an investigatory stop whenever an officer 'has reason to believe that the suspect

is armed and dangerous.'" *United States v. Pontoo*, 666 F.3d 20, 30 (1st Cir. 2011) (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)); *see also Terry*, 392 U.S. at 27.  The officer must have "some articulable, reasonable suspicion that the" person to be frisked "may be dangerous." *United States v. McGregor*, 650 F.3d 813, 820 (1st Cir. 2011).

"[R]easonable suspicion must be premised upon 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Pontoo*, 666 F.3d at 27–28 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)); *see also United States v. Hensley*, 469 U.S. 221, 229 (1985) (explaining that there must be "specific and articulable facts" supporting reasonable suspicion).  The existence of reasonable suspicion depends on the "totality of the surrounding circumstances," *Dion*, 859 F.3d at 124, with "a measurable degree of deference to the perceptions of experienced law enforcement officers," *United States v. Ruidíaz*, 529 F.3d 25, 29 (1st Cir. 2008).  Reasonable suspicion "may be based on the collective knowledge of several officers."  *United States v. Cruz-Rivera*, 14 F.4th 32, 44 (1st Cir. 2021) (first citing *Hensley*, 469 U.S. at 231–32; and then citing *United States v. Barnes*, 506 F.3d 58, 62–63 (1st Cir. 2007)).  Thus, courts "look to the collective information known to the law enforcement officers participating in the investigation rather than isolate the information known by the individual arresting officer." *United States v. Azor*, 881 F.3d 1, 8 (1st Cir. 2017) (citing *Illinois v. Andreas*, 463 U.S. 765, 772 n.5. (1983)).

Authority for a traffic stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).  The "tolerable duration

of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Id.* (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).  "In carrying out the seizure's 'mission,' an officer is also permitted to undertake those 'ordinary inquiries incident to [the traffic] stop," "which include 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.'" *United States v. Clark*, 879 F.3d 1, 4 (1st Cir. 2018) (alteration in original) (quoting *Rodriguez*, 575 U.S. at 355).  Officers may also "inquire into the driver's itinerary." *Dion*, 859 F.3d at 125.  "[W]hile an officer's actions must bear some relation to the purpose of the original stop," officers may shift their "focus and increase the scope of" their "investigation by degrees if" their "suspicions mount during the course of the detention." *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001).  There "is no talismanic time beyond which any stop initially justified on the basis of [reasonable suspicion] becomes an unreasonable seizure under the [F]ourth [A]mendment." *United States v. Quinn*, 815 F.2d 153, 157 (1st Cir. 1987) (quoting *United States v. Davies*, 768 F.2d 893, 901 (7th Cir. 1985)).  Instead, the reasonableness of a stop's duration is evaluated on a case-by-case basis. *See*, *e.g.*, *United States v. Ramdihall*, 859 F.3d 80, 88 (1st Cir. 2017) (holding that an 82-minute stop was reasonable under the circumstances).

### 1. The Stop's Inception

I reject the Defendants' arguments that the initial stop was illegal because Agent Klutzaritz's reasonable suspicion that the Defendants were drug trafficking can be imputed to Trooper Williams.

This was not an ordinary traffic stop; instead, it was part of DEA's investigation into the Defendants.  As part of his investigation, Agent Klutzaritz asked the Maine State Police to find a pretextual reason to stop the Jeep.  The First Circuit has repeatedly held that one officer's "directive to stop" someone is "sufficient to attribute" the directing officer's reasonable suspicion to the officer initiating the stop.  *See*, *e.g.*, *Balser*, 70 F.4th at 621; *see also United States v. Meade*, 110 F.3d 190, 196–98 (1st Cir. 1997) (imputing a directing officers' probable cause to arrest the defendant to the arresting officer when the directing officer commanded the arresting officer to "locate the brown car and arrest the third man"); *United States v. Paradis*, 802 F.2d 553, 557 (1st Cir. 1986) (holding that an arrest by an officer "admittedly lack[ing] probable cause" was constitutional because DEA agents with knowledge giving rise to probable cause instructed the officer to make the arrest).  In these so-called "[v]ertical collective knowledge cases," *Balser*, 70 F.4th at 619, the directing officer must independently have reasonable suspicion.  *See Meade*, 110 F.3d at 193–94 ("[W]hen a law enforcement officer with information amounting to probable cause directs an officer who lacks the knowledge to make the arrest, we 'impute' to the arresting officer the directing officer's knowledge."); *see also United States v. Massenburg*, 654 F.3d 480, 493 (4th Cir. 2011) ("[T]he collective-knowledge doctrine simply directs us to substitute the knowledge of the *instructing officer or officers* for the knowledge of the *acting officer*; it does not permit us to aggregate bits and pieces of

12

information from among myriad officers, nor does it apply outside the context of communicated alerts or instructions."). Thus, in *Balser*, the First Circuit held that there was probable cause to stop, search, and seize the defendant's car because the directing officer had probable cause and instructed another officer to make the stop. 70 F.4th at 621.

This stop was constitutional because Agent Klutzaritz had reasonable suspicion to stop the Jeep and he instructed the Maine State Police to stop it. Beforehand, Agent Klutzaritz successfully obtained numerous search warrants—issued upon findings of probable cause—that Jackson and Corbett were trafficking drugs. One of these search warrants permitted Agent Klutzaritz to track the location of a cellphone associated with "Chinx." Gov't Ex. 3. On September 10, Agent Klutzaritz monitored this cellphone's location and saw that it was traveling from Quincy, Massachusetts, to Bangor. Gov't Ex. 4 at 1. He set up surveillance at a suspected co-conspirator's residence, where he thought that "Chinx" would go. *Id.* The white Jeep Cherokee, rented by Corbett, parked on that street, and two men went inside the residence. *Id.* at 2. The next day, Agent Klutzaritz saw that the cellphone traveled to Aroostook County, where, based on his investigation, he suspected that they were distributing narcotics and potentially firearms in exchange for cash, before returning to Bangor. Gov't Ex. 4 at 1. Based on his investigation, Agent Klutzaritz had "a particularized and objective basis" that the Defendants used the Jeep to distribute narcotics in Maine that weekend. *Pontoo*, 666 F.3d at 27 (quoting *Cortez*, 449 U.S. at 417); *see also United States v. Tom*, 988 F.3d 95, 99 (1st Cir. 2021) (holding that

there was reasonable suspicion that a car's occupants were involved in a drug transaction when they had "specific knowledge" that one of the occupants "sold drugs" that day).[5]

Because Agent Klutzaritz had reasonable suspicion that the Jeep was involved in drug trafficking, his instruction to stop the Jeep conferred reasonable suspicion to Trooper Williams.  *See Balser*, 70 F.4th at 621.  Having concluded that the stop was valid at its inception, I turn to Defendants' arguments that the officers' investigation exceeded its permissible scope and extended the stop's duration.

### 2.  *The Scope of the Officers' Investigation and the Stop's Duration*

Corbett and Jackson also argue that the officers' investigation exceeded its permissible scope and impermissibly extended the stop.  More specifically, they critique the officers' decision to order them outside of the vehicle, pat-frisk them, interrogate them, and have a K-9 sniff the vehicle.

I reject Defendants' arguments that this brief stop of about nine minutes (before the K-9 alerted on the Jeep) was somehow impermissibly long.  After stopping the Jeep, Trooper Williams explained why he stopped them, checked the Defendants' IDs and the vehicle's registration, and asked about the vehicle's rental status.  Gov't Ex. 7 at 2:45–

---

[5] In his reply brief, Jackson argues that Agent Klutzaritz did not have reasonable suspicion that the Defendants engaged in criminal activity while in Maine.  More specifically, Jackson observes that Agent Klutzaritz was not receiving text messages from Corbett's phone that weekend indicating that the Jeep was involved in drug trafficking.  Reply, ECF No. 650 at 3–4.  While text messages like these would have strengthened the Government's case, the absence of such messages is not fatal because "the requirement of reasonable suspicion is not a requirement of absolute certainty: 'sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment.'"  *New Jersey v. T.L.O.*, 469 U.S. 325, 346 (1985) (quoting *Hill v. California*, 401 U.S. 797, 804 (1971)).

5:50. All of this was among "those 'ordinary inquiries incident to [the traffic] stop.'" *Clark*, 879 F.3d at 4 (alteration in original) (quoting *Rodriguez*, 575 U.S. at 355). Because officers "may, as a matter of course" require "the driver of a car lawfully stopped for a suspected traffic violation" to exit his vehicle, Trooper Williams did not exceed the permissible scope of his investigation by having Jackson exit the vehicle. *Coplin*, 463 F.3d at 102. The same is true with respect to Sergeant Schmidt asking Corbett to exit the vehicle. *See Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (holding that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop").

The officers' decision to pat-frisk the Defendants did not exceed the permissible scope of investigation or unlawfully extend the stop. Having been instructed to stop the Jeep because of its involvement in drug trafficking, the officers had reasonable suspicion to believe that the men were "armed and dangerous." *Pontoo*, 666 F.3d at 30; *see also United States v. Arnott*, 758 F.3d 40, 45 (1st Cir. 2014) (holding that a frisk was permissible when, among other facts, the "police had strong reasons to believe that the occupants" had "just concluded a drug-related transaction" and describing the "connection between drugs and violence" as "legendary").[6]

Insofar as the Defendants critique the officers for inquiring into where they were coming from, their arguments are off the mark because officers may ask about a driver's itinerary. *See Chhien*, 266 F.3d at 10 (reasoning that "travel questions" "were within the

---

[6] As I have explained in ruling on Jackson's other motion to suppress, even if a pat-frisk was unsupported by reasonable suspicion, I would conclude that such an error is harmless. *See United States v. Jackson*, No. 1:22-CR-00023-LEW, 2024 WL 357005, at *5 n.6 (D. Me. Jan. 31, 2024).

ambit of" an officer's authority to detain the defendant and that "any effect they might have had on the duration of the detention" was permissible). Furthermore, the Defendants' inability to explain where they came from justified additional questions. *See United States v. Lamela*, 942 F.2d 100, 102 (1st Cir. 1991) (reasoning that "inconsistent responses to routine questions relating to the purpose of [the defendant's] travel" contributed to reasonable suspicion).

I discern no error from the officers' decision to have the K-9 sniff the Jeep. About seven-and-a-half minutes into the stop, Sergeant Schmidt went to get his K-9 from his vehicle. Gov't's Ex. 7 at 9:45–11:20. Within about ninety seconds, the K-9 was sniffing around the vehicle, and it alerted about twenty seconds later. *Id.* at 11:20–11:48. I cannot see how such a short period of time was unreasonable, especially in light of the officers' being told that the Jeep was likely involved in drug trafficking. Any delay related to the K-9 sniff was no "longer than reasonably needed to investigate the possible illegal activity." *Ramdihall*, 859 F.3d at 88.[7]

For these reasons, I reject the Defendants' arguments that the stop was invalid at its inception and that the scope of the officers' investigation was impermissible and unlawfully prolonged the stop. I next turn to Jackson's argument that his pre-*Miranda* statements should be suppressed.

---

[7] The Defendants do not challenge the K-9's reliability. *See generally Florida v. Harris*, 568 U.S. 237 (2013). Once the K-9 alerted, the officers had probable cause to search the vehicle, and the scope of a permissible investigation increased. *See United States v. Brown*, 500 F.3d 48, 57 (1st Cir. 2007) ("[A] reliable canine sniff outside a vehicle can provide probable cause to search the vehicle.").

## B.  Roadside Questioning

Jackson seeks suppression of his pre-*Miranda* statements during the traffic stop because he was not *Mirandized*.  The Government objects to suppression because Jackson was not in custody.

The Fifth Amendment of the Constitution provides: "No person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V. To safeguard the right against self-incrimination, the United States Supreme Court held in *Miranda v. United States* that a defendant's statements during a custodial interrogation are inadmissible during the prosecution's case in chief if the defendant was not advised of his *Miranda* rights and did not knowingly and intelligently waive his rights.  384 U.S. 436, 479 (1966).

For purposes of *Miranda*, a defendant is in custody if a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave."  *Howes v. Fields*, 565 U.S. 499, 509 (2012) (alteration in original) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).  Given this definition of custody, "*Miranda* warnings are [generally] not required during routine stops involving traffic matters."  *United States v. Campbell*, 741 F.3d 251, 265 (1st Cir. 2013); *see also Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (explaining why "the usual traffic stop is more analogous" to a *Terry* stop rather than a formal arrest).  But *Miranda* warnings become necessary when "a suspect has been 'subjected to restraints comparable to those associated with a formal arrest.'"  *Campbell*, 741 F.3d at 266 (quoting *Berkemer*, 468 U.S. at 441).

The *Miranda* custody analysis entails two steps.  First, in determining whether a reasonable person would have felt at liberty to terminate the interrogation and leave, a court considers "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *Cruz-Rivera*, 14 F.4th at 48 (quoting *United States v. Melo*, 954 F.3d 334, 340 (1st Cir. 2020)); *see also United States v. Ellison*, 632 F.3d 727, 729 (1st Cir. 2010) ("[B]ut a suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of *Miranda*."); *United States v. Jones*, 187 F.3d 210, 218 (1st Cir. 1999) ("[N]o single element dictates the outcome of this analysis . . . .").  Second, a court considers "the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Cruz-Rivera*, 14 F.4th at 48 (quoting *Melo*, 954 F.3d at 340).

Suppression of Jackson's pre-*Miranda* statements is inappropriate because Jackson was not in custody.  Under the first step of the custody analysis, the First Circuit has explained that public highways are "a neutral setting," so "police officers are not in a position to dominate as they are, for example, [when in] an interrogation room at a jailhouse." *Jones*, 187 F.3d at 218.  *But see Cruz-Rivera*, 14 F.4th at 49 ("Where, as here, the police are controlling the situation the neutrality of the site is arguably brought into question.").  Jackson interacted with two officers throughout the stop.  *See United States v. Crooker*, 688 F.3d 1, 12 (1st Cir. 2012) (holding that a defendant was not in custody when, among other factors, "no more than two agents were in direct conversation with" the

defendant "at one time"); *United States v. Hughes*, 640 F.3d 428, 437 (1st Cir. 2011) (reasoning that a roughly ninety-minute interview, with a twenty-minute pause to summon an EMT was "relatively short" and weighed against a finding that the defendant was in custody). While Jackson entered the police cruiser and talked with Trooper Williams, "the First Circuit has said when a police officer asks a citizen to enter a police car in connection with the traffic stop, this alone does not 'elevate the detention beyond a *Terry* stop.'" *United States v. Carr*, 534 F. Supp. 3d 143, 150 (D. Me. 2021) (quoting *United States v. Dunbar*, 553 F.3d 48, 56 (1st Cir. 2009)). Lastly, Jackson was not handcuffed when he made the pre-*Miranda* statements. Thus, Jackson makes a weak showing on the first step of the custody analysis.

Turning to the second step, Jackson fares no better because this stop, at least before Jackson was handcuffed and then *Mirandized*, was "more akin to a routine traffic stop" than the ordinary custodial interrogation. *Campbell*, 741 F.3d at 266; *see also id.* ("[W]e also have recognized that, as 'a general rule, *Terry* stops do not implicate the requirements of *Miranda*, because *Terry* stops, though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates *Miranda* warnings.'" (quoting *United States v. Streifel*, 781 F.2d 953, 958 (1st Cir. 1986))). Because Jackson was not in custody, his pre-*Miranda* statements will not be suppressed.[8]

---

[8] As Trooper Williams was removing Jackson's handcuffs, he asked Jackson how old he was, and Jackson answered that he was twenty-four years old. Gov't's Ex. 9 at 3:20–3:25. This was before Trooper Williams read Jackson his *Miranda* rights. Having been handcuffed, Jackson was arguably in custody at this point. *See United States v. Candelario-Santana*, 834 F.3d 8, 18 (1st Cir. 2016). "[T]he level of physical control officers exercise over a suspect 'carries the most weight' in determining whether such suspect was 'in custody' at the time of interrogation." *United States v. Davis*, 773 F.3d 334, 340 (1st Cir. 2014) (quoting

## C.  Cash Seizure

Jackson argues that the seizure of $57,255 was unconstitutional because the officers lacked probable cause that the cash was affiliated with drug trafficking.  The Government argues that Jackson lacks standing to challenge the cash seizure because he repeatedly denied ownership of the cash.[9]  Alternatively, the Government maintains that the officers had probable cause that the cash came from drug sales.

The Fourth Amendment forbids unreasonable seizures.  U.S. Const. amend IV.  This right "extends only to those places and interests in which the defendant has a reasonable expectation of privacy."  *United States v. Lewis*, 40 F.3d 1325, 1333 (1st Cir. 1994).  Thus, "the defendant carries the burden of making a threshold showing that he has 'a reasonable expectation of privacy in the area searched and in relation to the items seized.'"  *United States v. Stokes*, 829 F.3d 47, 51 (1st Cir. 2016) (quoting *United States v. Aguirre*, 839 F.2d 854, 856 (1st Cir. 1988)).  This requirement that a person "have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search" is referred to as standing.  *See Byrd v. United States*, 584 U.S. 395, 410 (2018).

---

*United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007)).  Thus, to demonstrate that a suspect is not in custody after being handcuffed, the Government must "point to some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm."  *United States v. Acosta-Colon*, 157 F.3d 9, 19 (1st Cir. 1988).  Because the parties have not sufficiently briefed whether Jackson was in custody after he was handcuffed and asked his age, my ruling does not extend to this one statement.  If Jackson seeks suppression of his answer, I welcome his additional arguments.

[9] Because Corbett does not challenge the cash seizure, I express no opinion as to whether Corbett has standing to challenge the cash seizure.

Seizures of personal property are generally "*per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place*, 462 U.S. 696, 701 (1983).   However, "the plain view doctrine permits the warrantless seizure of an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself." *United States v. Gamache*, 792 F.3d 194, 199 (1st Cir. 2015).   "[F]or purposes of the plain view doctrine, the relevant question is whether the officers had probable cause to believe that the seized objects were evidence of some" crime. *United States v. Sanchez*, 612 F.3d 1, 5 (1st Cir. 2010).

Thus, officers may seize an object without a warrant when "probable cause exists [because] the incriminating character of [the] object is immediately apparent to the police." *United States v. Paneto*, 661 F.3d 709, 714 (1st Cir. 2011) (second alteration in original) (quoting *Sanchez*, 612 F.3d at 5).   Officers "need not be certain of the incriminating character of an object, but, rather, must have a belief based on a 'practical, nontechnical probability' that the object is evidence of a crime." *Id.* (quoting *United States v. Giannetta*, 909 F.2d 571, 579 (1st Cir. 1990)); *see also Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

I conclude that Jackson lacks standing to challenge the cash seizure because he disclaimed any ownership interest in the cash.   Alternatively, I find that the officers had probable cause to seize the cash.

21

Having disclaimed any ownership of the cash, Jackson cannot now assert a cognizable Fourth Amendment interest in the cash. After Jackson was unhandcuffed and Trooper Williams read Jackson his *Miranda* rights, Trooper Williams asked Jackson who the cash belonged to, and Jackson said that the cash was not his and that he did not know who it belonged to. Gov't Ex. 9 at 4:23–5:56; Gov't Ex. 6 at 2. Thus. Jackson does not have a cognizable Fourth Amendment interest in the cash. *See United States v. De Los Santos Ferrer*, 999 F.2d 7, 9 (1st Cir. 1993) ("It is well established that one who abandons or disclaims ownership of an item forfeits any claim of privacy in its contents, and that as to that person the police may search the item without a warrant."); *see also Lewis*, 40 F.3d at 1333 (holding that the defendants lacked standing "because they failed to assert any privacy interest" "in support of their motion to suppress").

Even if Jackson had standing to challenge the cash seizure, the officers had probable cause that the cash came from illegal drug sales. Drawing on my analysis above, the officers had many reasons to believe that the Defendants were using the Jeep to traffic drugs while in Maine. The discovery of a large quantity of cash, which the Defendants could not reasonably explain, further confirmed their suspicions, giving the officers a "practical, nontechnical probability" that the cash was evidence of drug-related crimes. *Paneto*, 661 F.3d at 714 (quoting *Giannetta*, 909 F.2d at 579); *see also United States v. $21,510.00 in U.S. Currency*, 144 F. App'x 888, 889 (1st Cir. 2005) (per curiam) ("A large amount of hidden currency 'is strong evidence of . . . an illicit connection to drug trafficking.'" (quoting *United States v. $149,442.43 in U.S. Currency*, 965 F.2d 868, 877 (10th Cir. 1992))).

**CONCLUSION**

For the foregoing reasons, Corbett's Motion to Suppress (ECF No. 592); Jackson's Motion to Suppress (ECF No. 595); and the Defendant's Joint Motion for Conference of Counsel, or in the alternative, for Oral Argument on Motion to Suppress (ECF No. 683) are **DENIED**.

Dated this 7th day of February, 2024.

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE