UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | ) <br> ) <br> ) |
| v. | ) No. 1:22-cr-00023-LEW <br> ) |
| **DAQUAN CORBETT**, | ) <br> ) <br> ) |
| Defendant | ) |

### ORDER ON DEFENDANT'S MOTION TO SUPPRESS AND SUPPLEMENTAL MOTION TO SUPPRESS

Before the Court are Defendant Daquan Corbett's Motion to Suppress (ECF No. 590) and Supplemental Motion to Suppress (ECF No. 686). Corbett challenges the constitutionality of law enforcement's execution of a search warrant at his residence, arguing that the search warrant's factual basis relied on officers' observations during an unconstitutional search.

A hearing on Corbett's motions, with testimony from two officers, was held on April 10, 2024. Because I find that the officers observed marijuana in Corbett's residence during an illegal search, Corbett's Supplemental Motion to Suppress is GRANTED.

### BACKGROUND

Corbett is one of seventeen individuals indicted by a federal grand jury in February 2022 for his alleged role in conspiring to distribute methamphetamine and fentanyl.[1]

---

[1] All seventeen individuals were indicted for conspiring to distribute and possess with the intent to distribute 50 grams or more of methamphetamine, 500 grams or more of a mixture or substance containing methamphetamine, and 400 grams or more of a mixture or substance containing fentanyl. 21 U.S.C. § 846; *id.* §§ 841(a)(1), (b)(1)(A)(vi), (viii).

Corbett now moves to suppress all evidence seized by law enforcement during the execution of a search warrant at his residence. Based on the testimony and exhibits, I make the following findings of fact.[2]

Around 7:23 a.m. on February 15, 2022, law enforcement officers arrived at Corbett's residence in Quincy, Massachusetts, to execute an arrest warrant issued by this Court. The officers knew that Corbett was home because he was subject to GPS monitoring for an unrelated charge. Detective Christopher Klier of the Quincy Police Department knocked on Corbett's door and announced their presence. After three to five minutes, Corbett, who was on the phone with his attorney, came to the window and asked why they were there. Detective Klier explained that they had an arrest warrant.

Corbett opened the door, and Detective Sean Glennon placed him in handcuffs. A total of nine officers entered and spread throughout Corbett's residence to perform a protective sweep, looking for anyone who might pose a danger to them.[3]

---

[2] In his Supplemental Motion to Suppress, Corbett referenced thirty-nine video exhibits from a flash drive. At the suppression hearing, the flash drive was admitted as Defendant's Exhibit No. 1. For the sake of simplicity, I will refer to each video as a separate exhibit, as Corbett originally did in his Supplemental Motion. *See* Supp. Mot. to Suppress at 19.

[3] A "'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). "[I]ncident to" an arrest, officers can, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. Officers may perform a protective sweep beyond those limited spaces if they have "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warran[t]" them in believing "that the area [to be] swept harbor[s] an individual posing a danger" to them or others. *Id.* at 327 (internal quotation marks omitted); *see also United States v. Hernandez-Mieses*, 931 F.3d 134, 141 (1st Cir. 2019). It is unclear whether some of the officers went upstairs during the protective sweep. Corbett's video exhibits show several officers entering into a hallway leading to both his living room and the second floor, where Corbett's bedroom was. Def.'s Ex. 1 at 1:42–2:08. Detective Klier testified that he could not recall if the officers went upstairs during the protective sweep. Regardless of where the officers went during the protective sweep, it appears

Corbett asked the officers if he could put on warmer clothes. The officers explained that they would leave Corbett's residence, and they asked if Corbett wanted his door locked. Corbett said that his keys were upstairs, and Detective Glennon asked Corbett if he wanted to go upstairs to get his keys. Corbett said yes, and Detective Glennon, followed by another officer, passed by Corbett's kitchen countertop as they escorted Corbett upstairs. Meanwhile, a handful of officers remained downstairs. One officer came downstairs and told the others that he saw "nothing" except for "two" or "three stacks of cash." Def.'s Ex. 3 at 1:55–2:04.

After Corbett put on warmer clothing upstairs, Detective Glennon escorted him back downstairs. As Corbett and the officers were leaving, Corbett complained about an officer "in the living room," lamenting "it's still my home, come on." Def.'s Ex. 5 at 1:24–1:31. One officer said, "we're gonna lock the door" as he walked out with the others. *Id.* at 1:36–1:38.

After Corbett and many of the officers left the residence, Detectives Klier and Glennon remained inside, where Detective Glennon told Detective Klier that he saw "three stacks" of cash. Def.'s Ex. 6 at 0:07–0:27. Two officers reentered the residence and spoke with the Detectives near Corbett's kitchen, where Detective Glennon said that the cash might be "proceeds or something." *Id.* at 0:32–0:34. Detective Glennon also explained that Corbett had a "fist-sized wad of rubber bands in his pocket." *Id.* at 0:40–0:47. One officer interjected, expressing doubt that they could "get paper" for the residence because

---

that they stayed there longer than necessary to perform a cursory inspection and dispel their suspicion of danger. *Cf. Buie*, 494 U.S. at 335–36.

3

they "just went through this in Maine," where it was a "fucking clusterfuck because it was out of district." *Id.* at 0:50–0:58. He said that they could get a warrant from state court, and Detective Glennon said that "they would need pc though." *Id.* at 1:01–1:08. Detective Klier spoke with Special Agent Bryan Klutzaritz of the Drug Enforcement Administration on speakerphone, explaining that they saw "a whole bunch of cash in plain view in the bedroom" and that "there's probably a lot more here." *Id.* at 1:31–1:37. Detective Glennon said "rubber bands," and Detective Klier told Agent Klutzaritz that Corbett had a "big wad of rubber bands in his pocket." *Id.* at 1:37–1:42. Detective Klier was not sure that they could "write for it." *Id.* at 1:43–1:48. Agent Klutzaritz mentioned a "prosecution memo" and said that he "would figure something out." Def.'s Ex. 7 at 0:15–0:20.

Four officers—still inside of Corbett's residence—discussed their observations once again. Detective Glennon walked by the kitchen countertop, stopped, and looked down. *Id.* at 0:45–0:52. Detective Glennon said: "We're here lawfully. He requested to go to his own bedroom. Upon entering his own bedroom, we see what we see." *Id.* at 0:52–1:00. Detective Glennon, standing in front of the countertop and looking down, said "umm," and he reached down to touch a bag and curiously announced, "there is a shit load of weed right there." *Id.* at 1:00–1:06. Detective Glennon pointed out some other objects near the countertop that they "could write for proceeds." *Id.* at 1:05–1:20. Detective Glennon asked if they had "any intel that he's selling bulk marijuana," and the others said no. *Id.* at 1:18–1:26. Detective Glennon pointed out a bag and designer packages of

4

marijuana and explained that they were not consistent with the personal use of marijuana.[4] *Id.* at 1:30–1:50.  The officers discussed how much cash was upstairs, and Detective Glennon opined that there was between $3,000 and $5,000 and that the officers should "go see.  He's got that in plain view. . . .  [T]he fucking dipshit took us upstairs." Def.'s Ex. 8 at 0:20–0:49.

Detective Glennon said that they would "stay [there] and keep it frozen" and "make sure no one goes in" Corbett's residence. *Id.* at 1:04–1:08.  Officers continued to enter and exit Corbett's residence, with one officer saying that it was "too cold" outside.  Ex. 9 at 0:06–0:08.  Detective Glennon counted the packages of designer marijuana and explained that there was enough evidence that Corbett possessed marijuana with the intent to distribute it. *Id.* at 1:00–1:45.  One officer said that if they were going to lock the residence down, they should "do another security sweep" because they "did not" "go through this place very well." Def.'s Ex. 10 at 0:46–1:00.  Detective Glennon explained that they "had an issue with the State" because the "horrible caselaw" requires officers to "articulate [why they] believe someone is in the house" or that there is a "safety issue." *Id.* at 1:00–1:15.

Ultimately, Detective Klier applied for a search warrant.  Gov't's Ex. 1 (the search warrant).  In his affidavit, Detective Klier explained that Corbett's arrest stemmed from an investigation into a drug-trafficking organization spearheaded by Danielle and Sarah McBreairty in Maine that was allegedly supplied by Corbett and Daviston Jackson.

---

[4] Under Massachusetts law, individuals may lawfully possess up to ten ounces of marijuana in their primary residence.  *See* Mass. Gen. Laws Ann. Ch. 94G, § 7(a)(2).  However, it is a crime to "knowingly or intentionally" "posses[s]" marijuana "with intent to" "distribute" it.  Mass. Gen. Laws Ann. Ch. 94C, § 32C(a).

Detective Klier wrote that law enforcement obtained a search warrant to track Corbett's location, stopped Corbett and Jackson as they drove southbound on Interstate 95 in September 2020, and seized a large amount of cash.

Detective Klier explained that seventeen individuals were indicted in the U.S. District Court for the District of Maine for their alleged participation in the drug conspiracy and that this Court issued an arrest warrant for Corbett. He explained that the officers approached Corbett's residence around 7:23 a.m., knowing that he was inside. Detective Klier described how Corbett arrived at the door three to five minutes after he knocked and announced the officers' presence. He recounted how Corbett asked for warmer clothing and his keys. Detective Klier wrote that Detective Glennon "observed numerous packages of designer marijuana as well as a gallon sized ziplock bag containing more marijuana" while escorting Corbett to his bedroom. *Id.* at 8. Detective Klier explained how Detective Glennon saw two large stacks of banded currency on Corbett's bureau and how Corbett had a large wad of rubber bands in his pocket. Based on his knowledge that designer marijuana is profitable when sold in small quantities, Detective Klier asserted that the officers' observations amounted to probable cause that Corbett was involved in a conspiracy to distribute marijuana and that his residence contained evidence of the illegal distribution of marijuana, and he requested authority to search the residence for such evidence.

The search warrant was granted around 12:45 p.m., and the officers searched Corbett's residence. They found, among other objects, several bags of a green-vegetable matter, a digital scale, plastic sandwich bags, a firearm, ammunition, approximately

$13,314, a ledger with names and phone numbers, and loose rubber bands. *See id.* at 2 (the inventory).

## DISCUSSION

In his Supplemental Motion, Corbett argues that the search warrant's affidavit relied upon the officers' observations during an unconstitutional search. Thus, he maintains that the evidence seized from his residence must be suppressed as "fruit of the poisonous tree." Supp. Mot. to Suppress at 3 (quoting *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)). The Government defends the constitutionality of the residence search, arguing that all of the officers' observations were made during a lawful search.

### A. The Observations by Law Enforcement

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "personal rights which" the Fourth Amendment "secures" "have a long history." *Silverman v. United States*, 365 U.S. 505, 511 (1961). Over four hundred years ago, the King's Bench articulated the foundational principle of English law that "the house of every one is to him as his castle and fortress." *Payton v. New York*, 445 U.S. 573, 596 n.44 (1980) (quoting *Semayne's Case*, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195 (K.B. 1603)). In league with this principle, the Supreme Court has explained that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id.* at 585 (quoting *United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972)); *see also Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and

7

there be free from unreasonable governmental intrusion.'" (quoting *Silverman*, 365 U.S. at 511)).

The Fourth Amendment was a "response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (quoting *Riley v. California*, 573 U.S. 373, 403 (2014)). The Founding generation's "[o]pposition to such searches was in fact one of the driving forces behind the Revolution itself." *Riley*, 573 U.S. at 403. The patriot James Otis's 1761 speech condemning writs of assistance was, as John Adams wrote, "the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born." *Id.* (quoting 10 Works of John Adams 248 (Charles F. Adams ed. 1856)). Otis's speech "helped spark the Revolution itself." *Carpenter*, 585 U.S. at 304; *see also Boyd v. United States*, 116 U.S. 616, 625 (1886) ("James Otis pronounced [the writs of assistance as] the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English law book; since they placed the liberty of every man in the hands of every petty officer." (internal quotation marks omitted)).

Inspired by this colonial history, the Founding generation ratified the Fourth Amendment in 1791, thereby requiring that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The warrant requirement is not a mere "formalit[y]." *McDonald v. United States*, 335 U.S. 451, 455 (1948). Rather, the

8

requirement "of a search warrant serves a high function." *Id.* Unless there is "some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police." *Id.* The magistrate brings an "an objective mind [to] weigh the need to invade" someone's "privacy in order to enforce the law." *Id.*

Searches "conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). However, an "arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within" it. *Payton*, 445 U.S. at 603; *see also United States v. Graham*, 553 F.3d 6, 12 (1st Cir. 2009). In conjunction with arresting "a suspect in his home pursuant to an arrest warrant," officers may perform a protective sweep if they have "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warran[t]" them in believing "that the area [to be] swept harbor[s] an individual posing a danger" to them or others. *Maryland v. Buie*, 494 U.S. 325, 327 (1990) (internal quotation marks omitted).

Observations by law enforcement of "item[s] in plain view d[o] not constitute a search so long as" officers make their "observation[s] from a lawful vantage point." *Spencer v. Roche*, 659 F.3d 142, 149 (1st Cir. 2011) (first citing *Minnesota v. Dickerson*, 508 U.S. 336, 375 (1993); and then citing *Horton v. California*, 496 U.S. 128, 133 n.5 (1990)); *see also United States v. Hernandez-Mieses*, 931 F.3d 134, 140 (1st Cir. 2019)

9

(reasoning that "[b]y virtue of [an] arrest warrant," "agents were lawfully in a position" when they saw various objects inside the defendant's house).

Corbett argues that "[l]aw enforcement blatantly violated [his] Fourth Amendment rights after placing him in handcuffs inside his home" because they "immediately 'fann[ed] out' into the residence to search it without a warrant." Supp. Mot. at 10–11. The Government disagrees, arguing that the arrest warrant permitted the officers to enter Corbett's residence to arrest him and that the officers had reasonable suspicion to perform a protective sweep. Gov't's Resp. in Opp'n at 5–10 (ECF No. 693). The Government, correctly, notes that "law enforcement did not make any observations or obtain any evidence during the protective sweep." *Id.* at 10. Instead, the search warrant affidavit as well as the Detectives' testimony demonstrate that the officers made their observations after Corbett "asked to go upstairs." *Id.*

Once Corbett was in custody, he told the officers that he wanted to go to his bedroom, so the officers were "authorized to accompany him to his room." *Washington v. Chrisman*, 455 U.S. 1, 6 (1982); *see also United States v. Berkowitz*, 927 F.2d 1376, 1389 (7th Cir. 1991) (holding that even if the defendant in custody did not consent to be followed to his office to get his keys, the officer could follow him because an "officer's authority to monitor a suspect does not depend on the suspect's consent; a suspect under arrest has no right to wander off on his own"). As Chief Justice Burger colorfully wrote, once an individual is in custody, officers "ha[ve] a right to remain literally at [the individual's]

10

elbow at all times." *Chrisman*, 455 U.S. at 6. Thus, the officers lawfully observed the stacks of cash in Corbett's bedroom and the rubber bands in Corbett's pocket.[5]

Like the stacks of cash and rubber bands, the Government maintains that the "officers saw the packages of marijuana in [Corbett's] kitchen" after he "asked to go upstairs." Gov't's Resp. in Opp'n at 10. In support, the Government heavily relies upon the testimony of Detectives Glennon and Klier. Detective Glennon testified that he saw the marijuana as he was escorting Corbett to his bedroom. Furthermore, Detective Klier testified that Detective Glennon told him about the marijuana, cash, and rubber bands after he returned downstairs. The Government's reliance on Detective Glennon's historicity of events is overwrought and its reliance on Detective Klier's tautological testimony nets it no gain.

Insofar as Detective Glennon testified that he saw the marijuana while escorting Corbett to his bedroom, I cannot find his testimony to be credible. Having carefully reviewed Corbett's exhibits, I find that the marijuana was not seen until well after the officers removed Corbett from his residence.

Corbett's home security video camera exhibits demonstrate that Detective Glennon was looking straight ahead and slightly upward toward Corbett and the stairway, rather than looking down and to the right at the small countertop where the marijuana was located, as he escorted Corbett at a brisk pace by that location. Def.'s Ex. 2 at 1:01–1:06.

---

[5] Detective Glennon did not testify as to how he observed the rubber bands in Corbett's pocket. The search warrant affidavit states that Detective Glennon observed the rubber bands in connection with performing a pat frisk. *See* Gov't's Ex. 1 at 7. Corbett does not specifically challenge the lawfulness of this pat frisk and Detective Glennon observing the rubber bands.

Furthermore, one officer was standing in front of the countertop and seemingly blocking Detective Glennon's view of the countertop and marijuana. Afterwards, Detective Glennon told Detective Klier that there were "two" or "three stacks" of cash upstairs that might be "proceeds" and that Corbett had a "fist-sized wad of rubber bands in his pocket." Def.'s Ex. 6 at 0:22–0:50. In response, one officer said that they could not get a search warrant from this Court since it was "out of district," so they would likely have to get a search warrant from state court, which Detective Glennon explained would require "pc." *Id.* at 0:50–1:03. As Detective Klier spoke with Agent Klutzaritz on speakerphone, he explained that there "was a whole bunch of cash in plain view in the bedroom," and Detective Glennon interjected, saying "rubber bands," which prompted Detective Klier to explain that Corbett had rubber bands in his pocket. *Id.* at 1:31–1:41. At no time during this conference-committee search for the basis of a search warrant, occurring somewhat ironically inside Corbett's residence where law enforcement had no right to be, did anyone mention marijuana. That seems just north of peculiar.

 As the officers continued discussing how to go about getting a search warrant, Detective Glennon walked by the countertop, looked down, and declared serially in a style half haiku and half Fourth Amendment charades: "We're here lawfully. He requested to go to his own bedroom. Upon entering his own bedroom, we see what we see." Def.'s Ex. 7 at 0:52–1:00. The things seen in the bedroom appear to have been insufficient to apply for a search warrant based on the conversation among law enforcement personnel. It was at this point that Detective Glennon, standing in front of the countertop and looking down, said "umm," reached down, touched a bag, and curiously announced as if solving for the

missing variable, "there is a shit load of weed right there." *Id.* at 1:00–1:06. This was the first time that anyone announced or seemingly realized that there was marijuana in the residence. Detective Glennon then pointed out two other objects that they "could write for proceeds" and asked the others if they had "any intel that he's selling "marijuana," and the officers said no. *Id.* at 1:05–1:26. Detective Glennon pointed out a "bag" and several "designer packages," explaining how they were not consistent with "personal use." *Id.* at 1:33–1:52.

While the marijuana may have been located within several officers' field of vision as they were lawfully within the residence, Corbett's exhibits demonstrate that nobody *realized* that marijuana was in the residence until after the officers took Corbett away for booking. Had the officers realized that marijuana was in the residence, they certainly would have mentioned it when discussing whether they could obtain a search warrant. Instead, nobody contemplated the possibility of obtaining a marijuana-related search warrant until after Detective Glennon touched the bag of marijuana and told the others about it.

By then, the officers' continued presence in Corbett's residence was in flagrant violation of the Fourth Amendment. Corbett had already been removed from the residence, so the officers had no right to remain in his residence by virtue of the arrest warrant. Furthermore, "[t]here is no question that the police had no right to 'freeze' the Quincy apartment where that meant entering it, looking around, searching, all the while ostensibly waiting for someone to get a warrant. Nothing in First Circuit or Supreme Court case law remotely justifies such a step." *United States v. Dessesaure*, 429 F.3d 359, 370 (1st Cir.

13

2005) (quoting *United States v. Dessesaure*, 314 F. Supp. 2d 81, 92 (D. Mass. 2004)). James Otis would recoil at the officers rummaging through Corbett's residence for evidence to obtain a search warrant long after they were authorized to be there. One sympathizes.

Having concluded that the marijuana was not lawfully observed, I proceed to analyze whether the evidence seized during the warrant-backed search must be suppressed.

### B. The Exclusionary Rule

The exclusionary rule is "a prophylaxis against unreasonable searches" that "prohibits introducing the fruits of an unlawful search into evidence." *United States v. Royle*, 86 F.4th 462, 468 (1st Cir. 2023) (quoting *United States v. Flores*, 888 F.3d 537, 545 (1st Cir. 2018)). Under the independent-source doctrine, "evidence acquired from a lawful source that is independent of any Fourth Amendment infraction" remains admissible. *United States v. Ponzo*, 853 F.3d 558, 573 (1st Cir. 2017). When "information is obtained through an illegal search, then through a later, warrant-backed search," the later search's fruits are admissible unless "(1) 'the agents' decision to seek the warrant was prompted by what they had seen during' the illegal search or (2) 'information obtained during that [illegal search] was presented to the Magistrate and affected his decision to issue the warrant.'" *Royle*, 86 F.4th at 468 (alternation in original) (quoting *United States v. Soto*, 799 F.3d 68, 82 (1st Cir. 2015)); *see also Murray v. United States*, 487 U.S. 533, 542 (1988). The Government must demonstrate, "by a preponderance of the evidence, that the search was an independent source of the evidence in question." *United States v. Siciliano*, 578 F.3d 61, 68 (1st Cir. 2009).

14

The first prong is "a subjective analysis," examining whether "'these particular police officers [would] have sought the warrant even if they had not known, as a result of the illegal search,' that relevant evidence was present." *Soto*, 799 F.3d at 82 (quoting *Dessesaure*, 429 F.3d at 369); *see also Dessesaure*, 429 F.3d at 369 ("[T]he district court is not bound by after-the-fact assurances of [an officer's] intent, but instead must assess the totality of the attendant circumstances to ascertain whether those assurances appear 'implausible.'" (quoting *Murray*, 487 U.S. at 540 n.2)).

The second prong requires a court to "excise the offending information and evaluate whether what remains is sufficient to establish probable cause." *Soto*, 799 F.3d at 82 (quoting *Dessesaure*, 429 F.3d at 367). Thus, courts examine whether the non-offending information within a search warrant "demonstrate[s] probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched—the so-called 'nexus' element." *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999). "Under the 'probable cause' standard, the 'totality of the circumstances' disclosed in the supporting affidavits must demonstrate 'a *fair probability* that contraband or evidence of a crime will be found in a particular place.'" *United States v. Zayas-Diaz*, 95 F.3d 105, 111 (1st Cir. 1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

The Government has not made a favorable showing on either prong.[6]

---

[6] The Government argues that the inevitable discovery exception applies, but the independent-source rule is the proper standard for analyzing whether information obtained during an illegal search and then subsequently through a warrant-backed search remains admissible. *See Royle*, 86 F.4th at 468. Nonetheless, the Government cannot prevail under the inevitable discovery exception, which considers "whether the legal means by which the evidence would have been discovered was truly independent;"

15

Regarding the first prong, the officers clearly would not have applied for the search warrant requesting authority to search for evidence of Corbett's involvement in a conspiracy to distribute marijuana if they did not observe the marijuana. Corbett's exhibits reflect that the officers originally considered obtaining a search warrant, seemingly on the theory that the cash was related to the alleged drug conspiracy in Maine.[7] But after Detective Glennon observed the marijuana, the officers' attention shifted, and Detective Klier ultimately sought a search warrant based on the theory that Corbett was engaged in a conspiracy to distribute marijuana. *See* Gov't's Ex. 1 at 7 (alleging "probable cause to believe that [Corbett] is involved in an ongoing criminal conspiracy to distribute Marijuana and that proceeds from the sale of marijuana and other evidence related to the distribution of marijuana in violation of MGL 94C will be found within" his residence). Tellingly, even after the marijuana was observed, the officers acknowledged that they had no other information suggesting that Corbett was involved in distributing marijuana. Def.'s Ex. 7 at 1:17–1:26. Undoubtedly, the officers would not have applied for *this* marijuana-based search warrant if they did not observe the marijuana.

Turning to the second prong, once the marijuana is excised from the search warrant, the search warrant necessarily fails to establish probable cause that Corbett committed any

---

"whether the use of the legal means would have inevitably led to the discovery of the evidence;" and "whether applying the inevitable discovery rule would either provide an incentive for police misconduct or significantly weaken constitutional protections." *United States v. Almeida*, 434 F.3d 25, 28 (1st Cir. 2006). The subsequent warrant-backed search was not truly independent from the officers observing the marijuana since the marijuana became the basis of the search warrant.

[7] It is possible that the officers would have applied for *a* search warrant under this theory. Factually, given the officers' discussion, I am not persuaded that the officers ultimately would have applied for such a warrant. But even if I did make such a finding, it would be legally irrelevant because the question is whether the officers would have applied for *the* same search warrant. *See Royle*, 86 F.4th at 468.

marijuana-related offense or that his residence might contain evidence of such an offense. The officers' knowledge that Corbett was allegedly a participant in a drug-trafficking conspiracy involving methamphetamine and fentanyl in Maine as well as their observations of cash and rubber bands have no connection to marijuana.

## CONCLUSION

For these reasons, Corbett's Supplemental Motion to Suppress (ECF No. 686) is **GRANTED**.[8] In light of this ruling, Corbett's Motion to Suppress (ECF No. 590) is **DISMISSED AS MOOT**.[9]

SO ORDERED.

Dated this 24th day of April, 2024.

/s/ Lance E. Walker
Chief U.S. District Judge

---

[8] This ruling does not affect the Government's ability to present testimony concerning the stacks of cash in Corbett's bedroom and the rubber bands within Corbett's pocket as these were lawfully observed.

[9] Corbett's Motion to Suppress concerned whether the search warrant affidavit established probable cause to believe that he was engaged in distributing marijuana.