UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:22-cr-00023-SDN-1 |
| DAQUAN CORBETT, and | ) | 1:22-cr-00023-SDN-2 |
| DAVISTON JACKSON, | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In December 2024, the Court held a two-week bench trial in this matter. Based on the evidence presented at trial, the Court makes the following findings of fact and conclusions of law.

**PROCEDURAL STATEMENT OF CASE**

On February 9, 2022, a federal grand jury returned a six-count Indictment against seventeen individuals. Defendants Daquan Corbett and Daviston Jackson ("Defendants") were charged along with the other fifteen defendants in Count One of the Indictment with conspiracy to distribute 50 grams or more of methamphetamine, 500 grams or more of a substance containing methamphetamine, and 400 grams or more of a substance containing fentanyl,[1] from January 1, 2018, to December 31, 2021, in the District of Maine, in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1), (b)(1)(A)(vi), (b)(1)(A)(viii).

---

[1] The Indictment used the chemical name for fentanyl, N-phenyl-n-[1-(2-phenylethyl)-4-piperidinyl] propanamide.

1

The matter was scheduled for jury selection and trial in early September 2024, but was continued at Defendants' request. The Court reset jury selection for November 6, 2024. On that day, Defendants moved to continue jury selection and to obtain data from the Clerk's office regarding the jury selection process, which Defendants indicated they wanted to challenge based on the racial composition of the jury. The Court granted the motion to continue and granted requests for jury selection data. On November 21, 2024, Defendants moved to dismiss the jury pool as not a fair and impartial collection of jurors. The Court orally denied the motion on November 26, 2024. ECF No. 886; *see* ECF No. 890 (subsequent written order). The same day, with the Government's consent, both Mr. Corbett and Mr. Jackson waived their right to a jury trial and executed written waivers thereof. ECF Nos. 887–88. The Court granted their request and began a bench trial on December 3, 2024, that ended on December 16, 2024.

During trial, the Court heard from forty-nine witnesses and saw hundreds of pages of exhibits. Based on that evidence, the Court makes the following findings of fact.

## FINDINGS OF FACT[2]

The evidence shows Mr. Corbett and Mr. Jackson conspired with a series of subsidiary dealers in Maine to distribute massive quantities of methamphetamine and fentanyl and other narcotics from 2018 through 2021.[3] Mr. Corbett, Mr. Jackson, and those dealers mutually understood and tacitly agreed to distribute the drugs Mr. Corbett

---

[2] These findings of fact are based on the testimony of the numerous witnesses, including many cooperating co-conspirators, that the Court found credible, as well as exhibits the court found credible and corroborating.

[3] The Court considers whether or not the Government has proven beyond a reasonable doubt each Defendant's culpability on an individual basis. However, because Mr. Corbett and Mr. Jackson participated together in the conspiracy the Court occasionally refers to them together when describing facts relating to both Mr. Corbett and Mr. Jackson.

and Mr. Jackson supplied. Many of the dealers testified to the roles they played in the conspiracy—and to Mr. Corbett and Mr. Jackson's central position therein as the suppliers of those drugs.

As the Court explains further below, Mr. Corbett and Mr. Jackson conspired with numerous co-conspirators, including Danielle McBreairty, Sarah McBreairty, Nikolas Raines, Shelby Loring, Justin Warman, Carol Gordon, James Valiante, Blaine Footman, Nicole Footman, John Miller, Joshua Young, Aaron Rodgers, Joshua Jerrell, and others to distribute methamphetamine and fentanyl. Some co-conspirators, including Danielle McBreairty, Sarah McBreairty, Nikolas Raines, Shelby Loring, Justin Warman, Carol Gordon, and James Valiante purchased narcotics directly from Mr. Corbett and Mr. Jackson for the purpose of using and distributing the drugs. Some co-conspirators, including Blaine Footman, Nicole Footman, John Miller, Joshua Young, Aaron Rodgers, and Joshua Jerrell used and distributed narcotics supplied by other co-conspirators whom Mr. Corbett and Mr. Jackson had supplied. Throughout the conspiracy, Mr.

Corbett used the alias "Chinx"[4] and Mr. Jackson used the alias "Matty."[5] The Court finds that Chinx is Mr. Corbett and Matty is Mr. Jackson.[6]

---

[4] In their trial testimony, Nicole Ferree, Nikolas Raines, Justin Warman, Carol Gordon, and Shelby Loring identified Mr. Corbett in court as the person they knew as Chinx. On cross-examination, Ms. Loring admitted she also sometimes used the word Chinx in text and Facebook messages to refer to both Mr. Corbett and Mr. Jackson together. Sarah McBreairty and James Valiante identified Mr. Corbett as Chinx in a photo taken from Mr. Corbett's phone. Gov't Ex. 63. Sarah McBreairty also identified Chinx's voice on a voice recording on calls between Danielle McBreairty (Sarah's sister) and Chinx (at the number *6099) from the Penobscot County Jail as belonging to Chinx.

In addition, comparing GPS tracking data of Chinx's phone ending in *6099, *see infra* note 6, to physical surveillance of a vehicle rented by Mr. Corbett further corroborates Mr. Corbett's identity. The location data shows phone *6099 was in the same location as Mr. Corbett's vehicle over the period from September 10, 2020, to September 12, 2020. Indeed, on September 12, 2020, after DEA Agent Brian Klutzartiz stopped following Mr. Corbett's vehicle, police were able to relocate and stop the vehicle, and thereafter identify Mr. Corbett and Mr. Jackson as the occupants in the vehicle going southbound on Interstate 95 using the GPS tracking data. Police recovered approximately $57,000 in cash, bundled in smaller stacks of money wrapped in rubber bands, from multiple locations inside the vehicle occupied by Mr. Corbett and Mr. Jackson.

[5] In their trial testimony, Nicole Ferree, Nikolas Raines, Justin Warman, Carol Gordon, and Shelby Loring identified Mr. Jackson in court as the person they knew as Matty. In addition, Officer Michael Pina responded to Carol Gordon's house after a 9-1-1 hangup call where Ms. Gordon identified the individual with her as Matty. That individual identified as Matty then produced to Officer Pina several bank cards bearing the name Daviston Jackson.

[6] Mr. Corbett and Mr. Jackson used multiple phones throughout the conspiracy, which further corroborate their identity and their culpability. The Court finds Mr. Corbett used at least four phone numbers, with numbers ending in *6099, *7140, *3337, and *4537:

- Danielle McBreairty made eight recorded calls to number *6099 from jail, and Sarah McBreairty identified the voice on the end of *6099 as Chinx. GPS tracking of this phone aligned with the location of a car rented by Mr. Corbett and led police to the walled-off stop of Mr. Corbett (and Mr. Jackson) on September 12, 2020.
- Nikolas Raines testified Chinx gave Mr. Raines the number *7140 and Mr. Raines entered it into his contact list as "Chinx8." Carol Gordon testified Chinx used number *7140.
- Sarah McBreairty testified number *3337 belonged to Chinx.
- Justin Warman testified number *4537 belonged to Chinx.

The Court finds Mr. Jackson used at least four phones, with numbers ending in *9645, *3105, *3939, and *3243:

- Number *9645 was registered to Mr. Jackson. Number *9645 was also listed on Hertz and Enterprise car rental records for vehicles rented to Mr. Jackson. Mr. Jackson also gave number *9645 to New Hampshire State Police Trooper Geoffrey Miller during a traffic stop on May 27, 2020.

## I.    Distributors in the Conspiracy

### A. Nikolas Raines

Nikolas Raines first met Mr. Corbett in the fall of 2019 after Wayne Smith introduced them. During that first meeting, Mr. Raines bought crack and fentanyl from Mr. Corbett. Mr. Raines continued to buy narcotics for further distribution from Mr. Corbett a few times per week for the next few months until they had a falling out. Mr. Raines once purchased 100 grams of fentanyl from Mr. Corbett.

Mr. Raines bought drugs from Mr. Corbett at an apartment on Sanford Street in Bangor owned by Ron Spencer, referred to by multiple witnesses as "Shoes Off."[7] Gov't Exs. 30, 32A. Numerous co-conspirators also purchased drugs from Mr. Corbett and Mr. Jackson at the same "Shoes Off"/Sanford Street apartment, including Justin Warman and Shelby Loring. Indeed, Mr. Raines remembered being at the Sanford Street apartment with Ms. Loring, Mr. Corbett, and Mr. Jackson around February or March of 2020.

---

- Number *3105 was registered to Mr. Jackson. Tamara Davis testified that number *3105 was Mr. Jackson's phone number. She also saved number *3105 in her phone as "dj." In a text message on September 21, 2019, Ms. Davis referred to the person using number *3105 as "Daviston." Gov't Ex. 31B at 7. Ms. Davis testified that she was texting with Mr. Jackson and making plans to visit him in Maine throughout the day on September 20th and 21st, 2019, which is borne out by her messages with number *3105.
- Carol Gordon testified that number *3939 belonged to Matty. In response to a text message from an unknown number asking, "Who this anyway M or C?", the user of phone *3939 answered, "It's Matty." Gov't Ex. 72A at 6–7. In Danielle McBreairty's phone, number *3939 appears in her contact list as "the brothers."
- Justin Warman and Mr. Raines both testified Matty used number *3243. Mr. Raines entered number *3243 into his contact list as "Matty Chinx." Shelby Loring told Wayne Smith by Facebook message in June 2020 that number *3243 was "Matty's new number". *See* Gov't Ex. 110L. Matty gave Mr. Warman the number *3243 which Mr. Warman entered into his contact list as "Matty Chinx New."

[7] Mr. Spencer's Sanford Street apartment got its nickname because visitors had to take their shoes off before entering the apartment. The apartment door bore a sign reading "Shoes Off Outside." Gov't Ex. 30. Nikolas Raines, Shelby Loring, Carol Gordon, Justin Warman, Nicole Ferree, Sarah McBreairty, James Valiante, and Agent Brian Klutzartiz all identified a photo of the Sanford Street apartment in Government's Exhibit 32A.

Mr. Raines corroborated that Mr. Corbett worked with two other people, including Mr. Jackson—who Mr. Raines knew as Matty. Through their drug dealing, Mr. Raines got to know both Mr. Corbett and Mr. Jackson. At first, Mr. Raines bought drugs only from Mr. Corbett. Later, he sometimes bought drugs directly from Mr. Jackson. If Mr. Raines had a discrepancy or a problem when purchasing the narcotics, he would reach out to Mr. Corbett, who would tell Mr. Jackson how to resolve the problem.

Mr. Corbett told Mr. Raines that Mr. Corbett got his drugs from Massachusetts and transported them to Maine by car. At one point, Mr. Raines travelled to Massachusetts to purchase narcotics from people who Mr. Corbett set him up with.

Text messages between Mr. Raines and Mr. Corbett and Mr. Jackson further support the Court's finding that Mr. Raines conspired with Mr. Corbett and Mr. Jackson to distribute narcotics.[8] Gov't Exs. 83A–C. These text conversations are replete with discussions about their drug distribution conspiracy.[9] For example, in one exchange, Mr. Raines asked Mr. Jackson for "work," which, according to the testimony of Mr. Raines and others, meant Mr. Raines was looking for drugs. Gov't Ex. 83B at 6. In another exchange, Mr. Jackson asked if Mr. Raines "came up with the bread yet," meaning Mr. Raines owed Mr. Jackson money for drugs. Gov't Ex. 83B at 7. In yet another text exchange, Mr. Raines messaged Mr. Jackson, "Yo is that ice cream still at the crib?" to which Mr. Jackson replied, "Tonight." Gov't Ex. 83B at 43. According to Mr. Raines and others, ice cream is a slang term for methamphetamine. Mr. Jackson directed Mr. Raines

---

[8] In these exchanges, Mr. Raines texted with numbers *3243 (Mr. Jackson), *3939 (Mr. Jackson), and *7140 (Mr. Corbett). *See supra* note 6. Police extracted these messages from Mr. Raines's phone, which Bangor Police Detective Steve Pelletier seized from Mr. Raines on June 17, 2020.

[9] The Court presents messages exactly as written.

to "No shoes" via text message, referring to the apartment on Sanford Street where Mr. Raines purchased narcotics from Mr. Corbett and Mr. Jackson. On May 10, 2020, Mr. Jackson again told Mr. Raines by text to "Go to shoes off give him 8," Gov't Ex. 83B at 58, which Mr. Raines understood to mean he should go to the Sanford Street apartment and pay someone there $800 for a "finger" (or 10 grams) of narcotics.

Mr. Raines was arrested in Bangor on November 12, 2020.

### B. Shelby Loring

Shelby Loring met Mr. Corbett, who she knew as Chinx, through Wayne Smith, whom she dated and sold narcotics with in 2018. At that time, Ms. Loring and Mr. Smith sold fentanyl and methamphetamine. Mr. Smith told Ms. Loring that he got the drugs they sold from a person named Chinx.

At some point, Mr. Smith and Mr. Corbett stopped dealing with each other because Mr. Smith was not paying Mr. Corbett. Mr. Corbett asked Ms. Loring to take over for Mr. Smith, which she did. Ms. Loring began fronting for Mr. Corbett—meaning he would give her the drugs, and she would pay him back after she had resold the drugs. Through Mr. Corbett, Ms. Loring met Mr. Jackson—who she knew as Matty.

To pick up the drugs, Ms. Loring would call or text Mr. Corbett (and eventually Mr. Jackson) asking to "swing by." Ms. Loring would ask for "up" if she wanted methamphetamine and "down" if she wanted fentanyl. If Mr. Corbett or Mr. Jackson answered in the affirmative, Ms. Loring would go to Ron Spencer's Sanford Street apartment, "Shoes Off," to pick up the drugs. Usually, someone other than Mr. Corbett himself would be at the Sanford Street apartment to hand over the drugs. Sometimes, that person was Mr. Jackson.

When Ms. Loring was dealing drugs for Mr. Corbett and Mr. Jackson, she had 15 to 20 customers to whom she sold the drugs. She often communicated with those customers through her Facebook account under the pseudonym "Shelby Diana."[10]

Government's Exhibit 110A, which runs 60 pages and shows hundreds of Facebook messages sent between January 1, 2020, and February 9, 2021, regarding Ms. Loring and Mr. Corbett ("Chinx")'s drug dealing operations, supports the Court's findings. For example, in one message on February 28, 2020, Ms. Loring wrote to a customer, "Chinxs got new stuff. It burns better and what not but the high is still really good." Gov't Ex. 110A at 4. On March 29, 2020, Ms. Loring sent two messages to two customers, a few minutes apart: "Just found a baggie with chinxs dope in it" and "Legit found a bag of chinxs dope." Gov't Ex. 110A at 8. On April 9, 2020, Ms. Loring sent a message to another customer, asking, "He wama buy any chinxs dope." Gov't Ex. 110A at 10. Two days later, she messaged, "I miss chinxs I hate being without dope." Gov't Ex. 110A at 10.

Government's Exhibits 110B–110T similarly contribute to the Court's finding that Ms. Loring conspired with Mr. Corbett and Mr. Jackson to sell their drugs. For example, in one series of messages, Ms. Loring touted her "loyalty" to her "plug" (which she and others testified refers to a person who supplies drugs), Chinx. Gov't Ex. 110B. In another message, Ms. Loring claimed Chinx was coming with an "old school pack," meaning a kind of fentanyl that hadn't been around for a while. Gov't Ex. 110C. Ms. Loring told a customer that "Niko has chinxs dope" (in reference to co-conspirator Nikolas Raines) and that she needed "to go get it asap." Gov't Ex. 110G.

---

[10] The printout of messages from Ms. Loring's Facebook account ran over 30,000 pages. Only a small subset of those messages were admitted into evidence.

On May 31, 2021, Ms. Loring messaged one of her customers, asking, "Do you need any or what." Gov't Ex. 110K. The customer responded that he was "trying to get rid of this ice," referring to methamphetamine, so the customer could "go see matty when he gets here." Ms. Loring replied that Matty wasn't coming, but Chinx was. Gov't Ex. 110K. Ms. Loring knew, based on previous conversations with this customer, that this customer regularly went to the Sanford Street apartment to get drugs from Mr. Corbett and Mr. Jackson.

Ms. Loring's text communications with Mr. Jackson further corroborate the finding that she conspired with Mr. Corbett and Mr. Jackson to distribute drugs they supplied. For example, on May 10, 2020, Ms. Loring texted Mr. Jackson, "Hey its shelby. Got a new phone so delete any number you have for me besides this one much love." A few hours later she texted Mr. Jackson again, "My loyalty runs deep and I've got mad love for my boys so you dont have to worry on my end I'll always hold you down."[11] Gov't Ex. 72A at 78.

Ms. Loring stopped dealing for Mr. Corbett and Mr. Jackson around September of 2020. Wayne Smith had stolen Ms. Loring's money that she was planning to use to buy drugs from Mr. Corbett and Mr. Jackson, thereby frustrating her relationship with them.

---

[11] The texts originate from a number ending in *1220, which Ms. Loring testified was hers. Ms. Loring sent those texts to Mr. Jackson at number *3939. *See supra* note 6.

### C.  Danielle McBreairty

Danielle McBreairty did not testify at this trial.[12] However, other evidence introduced at trial shows that Danielle[13] conspired with Mr. Corbett and Mr. Jackson to receive drugs from them, including methamphetamine and fentanyl, which she then distributed across northern Maine. Danielle sold large quantities of methamphetamine and fentanyl supplied by Mr. Corbett and Mr. Jackson during the course of this conspiracy. Danielle texted Mr. Corbett and Mr. Jackson about drugs and the money she owed them. Danielle also told Tommy Hammond and Sarah McBreairty that Chinx supplied drugs to Danielle. Mr. Corbett told Nikolas Raines that Danielle was "good" after Mr. Raines suggested Mr. Corbett stop supplying drugs to Danielle.

John Miller (who others referred to as "Indian" or "the Indian"), sold methamphetamine and fentanyl in the Caribou, Maine[14] area, for Danielle between 2019 and Danielle's August 2020 arrest. Aaron Rodgers sold methamphetamine and fentanyl Danielle fronted him over approximately the same period of time. Joshua Jerrell sold methamphetamine for Danielle. Joshua Young bought fentanyl from Danielle. James Valiante bought narcotics from Danielle.

On multiple occasions, police officers discovered Danielle in possession of methamphetamine and fentanyl, and other tools and indicia of the drug trade. For example, Orono police officer Adam Oko searched Danielle's vehicle on August 10, 2020,

---

[12] *See In re: Testimony of Danielle McBreairty*, 24-cr-00143 (D. Me. Dec. 17, 2024) (holding Danielle McBreairty in contempt of court for disobeying order to testify).

[13] To avoid confusion, the Court refers to Danielle McBreairty and Sarah McBreairty, who are sisters, by their first names.

[14] Caribou is in Maine's northernmost county, Aroostook County, which is often referred to as "the county."

during a traffic stop. He found approximately $3,600 in $100 bills held together with elastic bands, approximately one gram of methamphetamine hidden inside a cigarette packet, and multiple cell phones. *See* Gov't Exs. 40–43, 43A–C.

On February 14, 2020, and February 27, 2020, agents working with the Maine Drug Enforcement Agency (MDEA) set up controlled buys using a confidential informant. Both times, the informant purchased methamphetamine from Danielle while under observation from MDEA agents. After the second buy, the agents searched Danielle and her vehicle and found a small quantity of methamphetamine, heroin, fentanyl, and a loaded gun. The agents also found a padlocked backpack, which they searched pursuant to a warrant, containing approximately four pounds of methamphetamine and half a pound of fentanyl, along with an envelope addressed to Danielle McBreairty and a digital scale. The agents arrested Danielle and seized a white phone belonging to her.

Text messages from this phone, and other phones Danielle used, support the Court's finding that Danielle conspired with Mr. Corbett and Mr. Jackson to sell drugs in northern Maine. For example, Government's Exhibit 36B shows a series of texts between Danielle and Mr. Jackson on February 22, 2020.[15] Danielle wrote, "Hey got stacks for ya. You guys should come here n grab it. I'm so exhausted." A "stack" is a $1,000 bundle of cash.

Another exhibit shows a text exchange between Danielle and Mr. Corbett beginning February 16, 2020.[16] Gov't Ex. 36C. Mr. Corbett told Danielle, "You gonna owe

---

[15] These texts are to Mr. Jackson's number at *3939. *See supra* note 6.

[16] These texts are to Mr. Corbett's number at *7140. *See supra* note 6.

17," to which Danielle McBreairty replied, "I had 24.5 my bad I was counting on the car. I'll have another few stacks in morning for them." Gov't Ex. 36C at 3.

On February 26, 2020, Danielle sent a message on Facebook to an unidentified recipient with a photo showing large amounts of cash spread across a bed, with the caption superimposed, "Stackin for a trip whaaaaat." Gov't Ex. 118D.

On June 20, 2020, Danielle texted Mr. Corbett[17] stating, "I have 10 stacks." Gov't Ex. 73A at 11. Mr. Corbett responded, "Ok finding ride now," to which Danielle replied, "I got 15 stacks." Two days later, Danielle texted Mr. Corbett, "Hey yeah I'm good. 32oz is what was there," to which Mr. Corbett replied, "I know they doin it by the p now," in reference to two pounds (32 ounces) of methamphetamine. Gov't Ex. 73A at 30.[18]

Witness testimony further supports the conclusion that Danielle sold large amounts of drugs supplied to her by Mr. Corbett and Mr. Jackson. Sarah learned from another dealer named Tommy Hammond, who worked with Danielle, that Mr. Corbett supplied Danielle. Mr. Hammond told Sarah that Chinx was Danielle's "guy," meaning supplier. In a text message sent on August 10, 2020, Mr. Hammond texted Danielle, saying Mr. Hammond and Danielle had been "marked the biggest fentanyl dealers in the county." Gov't Ex. 74B at 16. Danielle also told Sarah directly that Chinx was her "guy." Nikolas Raines spoke with Mr. Corbett after Danielle was arrested. Raines told Mr.

---

[17] These texts are to Mr. Corbett's number at *6099. *See supra* note 6. The phone number for Danielle in this exchange ends in *0179. DEA Agent Brian Klutzaritz testified he identified this number as Danielle's during his investigation. Phone records for number *0179 show messages from Tommy Hammond referring to the user of *0179 as "Danielle." Gov't Ex. 73A at 22.

[18] Agent Klutzartiz testified that "p" refers to pounds, and that only methamphetamine is measured in pounds.

Corbett he should "stop dealing with" Danielle because her arrest was suspicious, but Mr. Corbett assured Mr. Raines that Danielle was "good."

### D. Sarah McBreairty

When Sarah McBreairty moved to Bangor, Maine, in 2018 or 2019, she learned that her sister—Danielle—and Andrew Adams, who was an ex-romantic partner and co-parent of a child with Danielle, were selling methamphetamine and fentanyl out of their apartment at 89 5th Street. Sarah moved in nearby on 5th Street, and in time, she began helping her sister sell drugs—Sarah would pay Danielle's bills, rent vehicles, and "keep track of everybody." Eventually, Sarah began selling drugs on behalf of her sister.

When Danielle was arrested and detained in August 2020, several co-conspirators, including Mr. Corbett and Sarah, tried to collect money to pay her bail. During that period, Sarah had multiple phone conversations with Mr. Corbett about Danielle's bail money. Danielle and Mr. Corbett spoke several times about the efforts to get Danielle out of jail on bail, which were recorded.[19] Gov't Ex. 84–91. In those calls, Mr. Corbett told Danielle about his attempts to raise bail for her from various people, including Mr. Adams and Sarah. On August 20, 2020, Danielle gave Mr. Corbett Sarah's phone number. Gov't. Ex. 91. On August 22, 2020, Mr. Corbett told Danielle he had spoken with Sarah to collect bail money, but Sarah had disappeared and then refused to answer her phone. Gov't Ex. 90. The efforts to bail Danielle out of jail were unsuccessful.

A few weeks after Danielle's August 2020 arrest, Sarah met Mr. Corbett in person for the first time at her own house on 5th Street. Sarah called Mr. Corbett, who she referred to as Chinx, who arrived at Sarah's house with a friend, both wearing face masks.

---

[19] Danielle spoke with Mr. Corbett at his *6099 number. *See supra* note 6.

Two weeks after that first meeting, Mr. Corbett and another person delivered to Sarah approximately 500 grams of fentanyl and two pounds of methamphetamine for Sarah to sell on "front." After that first occasion, Sarah continued receiving methamphetamine and fentanyl from Mr. Corbett for Sarah to distribute. Though Mr. Corbett was not always the person who delivered the drugs in hand to Sarah, Sarah always placed the initial order for drugs with Mr. Corbett. To request more drugs, Sarah used coded or slang language: For example, Sarah might text Mr. Corbett to say she "was good" to indicate she had money to buy more drugs. Mr. Corbett would respond to tell her someone was on the way to deliver. If Sarah had guests, she told the guests to leave to protect the drug deliverer's identity.

Typically, Mr. Corbett provided 1,000 to 1,500 grams of fentanyl and four to six pounds of methamphetamine to Sarah with each delivery—twice per month. In return, Sarah paid Mr. Corbett by handing cash, in $5,000 bundles held together with rubber bands and placed in plastic bags, to whoever delivered the drugs.

Sarah's credible testimony, corroborated by co-conspirators, establishes that Sarah conspired with Mr. Corbett to distribute methamphetamine and fentanyl from late August or early September 2020 until a few months before her arrest in February 2022. Over that period, Mr. Corbett delivered to Sarah at least $1 million of methamphetamine (at $10,000 per pound) and $1.5 million of fentanyl (at $5,000 per 100 grams).[20]

Sarah used a network of dealers to distribute the drugs across Maine, including John Miller, Joshua Jerrell, Aaron Rodgers, Matthew Catalano (also known as "Tampa"),

---

[20] Therefore, by Sarah's "low" estimate, Mr. Corbett delivered to her 100 pounds of methamphetamine and 30 kilograms of fentanyl.

14

James Valiante, Blaine Footman, Nicole Footman, and Joshua Young. Sarah kept a whiteboard in her apartment to keep track of the money each dealer owed her.

The Court heard credible testimony from numerous witnesses regarding Sarah's drug dealing for Mr. Corbett. John Miller, also known as "Indian," sold drugs Sarah fronted to him.[21] Ultimately, Mr. Miller was over $100,000 in debt to Sarah for the fronted drugs. James Valiante bought drugs from both Sarah and Mr. Corbett. Sarah would tell Mr. Valiante when Mr. Corbett was coming to the area and would help coordinate "logistics" for Mr. Valiante to purchase drugs from Mr. Corbett. Joshua Young bought fentanyl from Sarah after Danielle went to jail. Mr. Miller, Mr. Valiante, and Mr. Young all lived in and distributed drugs in Aroostook County, in northern Maine.

Joshua Jerrell, who dated Sarah, also sold drugs with her. At one point, Mr. Jerrell delivered nine pounds of methamphetamine to Mr. Valiante on behalf of Sarah. Mr. Jerrell heard Sarah speaking on the phone with Mr. Corbett about bailing Danielle out of jail—Jerrell knew Sarah was speaking with Mr. Corbett because Sarah was using speakerphone and Mr. Jerrell could see a contact name reading "Chinx" on the phone screen.

Aaron Rodgers bought fentanyl and methamphetamine from Sarah after Danielle, whom he previously bought drugs from, went to jail. Mr. Rodgers used and also sold a small portion of the drugs he bought from Sarah. Blaine Footman bought fentanyl and methamphetamine from Sarah for about six months to one year before his arrest. Nicole Footman, who knew Sarah for approximately four years, also distributed drugs she purchased from Sarah.

---

[21] James Valiante also heard Sarah McBreairty talk about distributing drugs to "Indian."

Government Exhibits 75B, 76B, 77B, 78B, and 79B are replete with messages that corroborate the finding of a drug conspiracy involving Mr. Corbett. One series of text exchanges demonstrates the drug pipeline from Mr. Corbett to Sarah to Aroostook County dealers. On November 30, 2020, Mr. Corbett reached out to Sarah by text.[22] Gov't Ex. 75B at 13–14. Sarah responded that she would call him "in a few" but needed "up," meaning methamphetamine. Immediately after this text exchange with Mr. Corbett, Sarah texted Mr. Miller, saying, "Hey so they just hit me up. Just need what's up there to see where Im at n put in order do lmk.. If I havd to comr to you I will." Mr. Miller responded, asking for "three towards the sky and one or two down low"—meaning Mr. Miller wanted Sarah to order three pounds of methamphetamine and one or two pounds of fentanyl.

In another exchange, Sarah told Mr. Corbett that "everyone's out of everything," and asked, "Can we make something, anything happen tonight/tomorrow?" Gov't. Ex. 76B at 8. Mr. Corbett responded, "As soon as I get it I'm coming." Sarah then asked Mr. Corbett for "3 ^ 2 down" on behalf of James Valiante, and "7, brown and white . whatever you wanna do"—meaning three pounds of methamphetamine and 200 grams of fentanyl, and seven 100-gram balls of either heroin ("brown") or fentanyl ("white").

John Miller tried to repay his drug debt to Sarah by giving her firearms. Joshua Young corroborated this finding when he testified he delivered guns from Mr. Miller to Sarah to help pay off Mr. Miller's drug debt. Sarah also sometimes acted as a middleman to move firearms between Mr. Corbett and Mr. Miller. Mr. Miller testified he gave six or seven guns to the people who delivered drugs to him, but he did not identify those people.

---

[22] These texts are with Mr. Corbett's number at *3337. *See supra* note 6.

### E.  Justin Warman

Justin Warman first met Mr. Corbett in 2017 or 2018. An acquaintance of Mr. Warman's told Warman he could buy drugs at an apartment on Ohio Street in Bangor. Though Mr. Warman didn't see Mr. Corbett the first time Mr. Warman went to the Ohio Street apartment, Mr. Warman eventually met Mr. Corbett there on later dates. Mr. Warman's testimony establishes that he bought heroin, cocaine, and fentanyl at the apartment, sometimes directly from Mr. Corbett, once or twice per month. A year or so after first meeting Mr. Corbett, Mr. Warman met Mr. Jackson through Mr. Corbett. Mr. Warman bought drugs mostly for personal use, but also sometimes sold the drugs he bought from Mr. Corbett and Mr. Jackson in order to support his addiction.

Mr. Warman didn't always buy drugs from the Ohio Street apartment. He also bought drugs from Mr. Corbett and Mr. Jackson at Ron Spencer's "Shoes Off" apartment on Sanford Street, Carol Gordon's apartment on 1st Street, and an apartment on Warren Street. Sometimes, Mr. Warman texted Mr. Corbett and Mr. Corbett told Mr. Warman to go to a particular location where someone would hand over the drugs to Mr. Warman. Shelby Loring and Ms. Gordon were two of the people who gave Mr. Warman drugs on behalf of Mr. Corbett. Mr. Warman also bought fentanyl directly from Mr. Jackson. Sometimes Mr. Warman reached out to Mr. Jackson directly, and other times Mr. Warman texted Mr. Corbett but ended up getting the drugs from Mr. Jackson instead.

Mr. Warman would text Corbett in code to purchase fentanyl from him. Mr. Warman would ask Mr. Corbett if someone was "around" and if he could "stop by." If Mr. Corbett was around, Mr. Corbett would tell Mr. Warman the address where Mr. Warman could go to buy the drugs.

For example, in one text exchange, Mr. Warman asked, "What's up u around only got hundo but will be in town shortly" and Mr. Corbett, after asking how Mr. Warman got his number, told Mr. Warman to "come by." Mr. Warman asked where Mr. Corbett was, and Mr. Corbett responded, "Same place." Mr. Warman replied, "no shoes" and Mr. Corbett confirmed, "Yea." Gov't Ex. 112 at 5.[23] "No Shoes" referred to the Sanford Street "Shoes Off" apartment, where Mr. Warman and others bought drugs from Mr. Corbett and Mr. Jackson.

Mr. Warman stopped purchasing drugs from Mr. Corbett and Mr. Jackson in late 2020.

### F.  Carol Gordon

Carol Gordon first met Mr. Corbett, who she knew as Chinx, in the middle of 2019, at her own apartment at 67 1st Street, Bangor. The first time they met, Mr. Corbett told Ms. Gordon he wanted a place to stay and to sell drugs a couple of times per month. Mr. Corbett offered to give Ms. Gordon crack in exchange for the use of her residence to do this. Ms. Gordon agreed to let Mr. Corbett use her apartment to sell drugs from. The second or third time Mr. Corbett went to Ms. Gordon's apartment, Mr. Corbett brought Mr. Jackson, who Ms. Gordon knew as Matty, with him. Mr. Corbett and Mr. Jackson sold drugs—mostly crack and heroin, but eventually methamphetamine too—out of Ms. Gordon's apartment for two or three months.

When Mr. Corbett and Mr. Jackson sold drugs out of Ms. Gordon's apartment, Mr. Corbett told Ms. Gordon how to handle buyers who came to the apartment. Ms. Gordon usually answered the door to let buyers in. She would then go to the back room of her

---

[23] In this exchange, Mr. Corbett used the number *4537. *See supra* note 6.

apartment to find either Mr. Corbett or Mr. Jackson, or sometimes both. Mr. Corbett or Mr. Jackson then either came out to meet the buyer or instructed Ms. Gordon to send the buyer to the back room.

On one occasion, Mr. Jackson arranged for Tamara Davis to deliver methamphetamine from Rhode Island to Ms. Gordon's apartment. Ms. Davis was in a relationship with Mr. Jackson in 2019. On September 21, 2019, at Mr. Jackson's request, Ms. Davis picked up a backpack containing two kilograms of methamphetamine in Central Falls, Rhode Island, on her way to visit Mr. Jackson in Maine. *See* Gov't Ex. 62. That afternoon, Mr. Jackson sent Ms. Davis his location in Maine, saying "I'm here." Gov't Ex. 31C. The location corresponds to Ms. Gordon's address at 67 1st Street, in Bangor, Maine. Ms. Davis was stopped by the police on the way to Mr. Jackson's location. During the stop she called Mr. Jackson to inform him what was happening.

Mr. Corbett and Mr. Jackson abruptly stopped selling from Ms. Gordon's house after police came to the house to investigate a 9-1-1 hangup call on October 18, 2019. Ms. Gordon answered the door. The investigating police officer, Michael Pina, saw someone else inside the apartment, who Ms. Gordon identified to him as "Matty." Officer Pina spoke with Matty, who identified himself as Daviston Jackson. Mr. Jackson produced several bank cards bearing his name and told Officer Pina he was from the "New Hampshire and Massachusetts area."

### G. James Valiante

James Valiante began buying fentanyl and methamphetamine from Danielle McBreairty soon after her February 27, 2020, arrest. Mr. Valiante sometimes reached out to Danielle to buy drugs. Other times Danielle simply "showed up" with fentanyl and methamphetamine. On at least one occasion, Danielle brought Tommy Hammond to Mr.

19

Valiante's home and sold Mr. Valiante methamphetamine and fentanyl; Mr. Hammond was present during the sale.

Mr. Valiante met Andrew Adams through Danielle, and Mr. Adams and Mr. Valiante became friends. When Danielle remained in custody following her August 2020 arrest, Mr. Adams began to deal the drugs for Danielle. Mr. Adams later introduced Mr. Valiante to Mr. Corbett at Mr. Valiante's house in Aroostook County. Mr. Adams told Mr. Valiante that he and Mr. Corbett were in Aroostook County to sell dope (narcotics). Mr. Valiante bought methamphetamine and fentanyl from Mr. Corbett on that occasion and thereafter.

On September 6, 2020, Mr. Adams was arrested, and Mr. Valiante eventually began purchasing methamphetamine and fentanyl from Sarah McBreairty. He met Sarah when she came to his house to pick up a vehicle Danielle had left there. Mr. Valiante bought even more narcotics from Sarah than he bought from Danielle. As described above, Mr. Valiante understood that Mr. Corbett was Sarah's supplier. He occasionally saw Mr. Corbett while purchasing drugs at Sarah's 5th Street apartment and at the Sanford Street "Shoes Off" apartment. During the same period, Mr. Valiante also continued to purchase narcotics from Mr. Corbett directly.

On April 1, 2021, police stopped Mr. Valiante in Bangor and found 100 grams of fentanyl that Mr. Valiante had purchased from Sarah at 91 5th Street immediately prior. Mr. Valiante found the circumstances of the stop suspicious, so he largely ceased trafficking with Sarah and never heard from Mr. Corbett again. The stop was in fact orchestrated by DEA Agent Brian Klutzaritz, who had been surveilling the 5th Street apartment. Agent Klutzaritz saw a vehicle rented to Mr. Jackson parked near the apartment. He followed the vehicle briefly after it left. Agent Klutzaritz returned to the

5th Street apartment, where he saw Mr. Valiante arrive and then leave after 45 minutes. At that point, Agent Klutzaritz called the Bangor Police Department and requested they stop Mr. Valiante's vehicle.

Mr. Valiante estimated that Danielle, Sarah, and Mr. Corbett collectively sold Mr. Valiante a total of ten pounds of methamphetamine and two pounds of fentanyl between February 2020 and April 2021.

## II.    Other Co-Conspirators

### A.  Blaine Footman

Blaine Footman lived with Sarah McBreairty at 91 5th Street until his May 5, 2021, arrest. He bought fentanyl and methamphetamine from Sarah to use and sell for six to twelve months before his arrest. He also helped Sarah deliver the drugs she sold to Aroostook County.

Sarah told Mr. Footman that she got her drugs from Chinx and "Z."[24] Usually, when Sarah's suppliers came to deliver, she told Mr. Footman to go upstairs so he would not meet them. Sarah usually received five to ten pounds of methamphetamine and 1,000 to 2,000 grams of fentanyl at a time from Mr. Corbett.

A few times per week, Sarah gave Mr. Footman 100 to 200 grams of fentanyl and one to two pounds of methamphetamine to sell. Mr. Footman also transported a few times per week approximately 1,000 grams of fentanyl and five to seven pounds of methamphetamine to John Miller and other dealers in Aroostook County for Sarah. After each trip to Aroostook County, Mr. Footman brought back between $70,000 and $125,000 that he had received from Mr. Miller and other Aroostook County dealers and

---

[24] Mr. Footman, Shelby Loring, and Sarah McBreairty all mentioned the name "Z" at trial, but the Government did not present evidence as to Z's identity.

delivered the money to Sarah. Sarah paid Mr. Footman in cash or in drugs for making the deliveries.

## B.  Nicole Footman

Nicole Footman first met Sarah McBreairty through Ms. Footman's brother, Blaine Footman. Beginning in late 2020 or early 2021, Sarah supplied Ms. Footman with fentanyl and methamphetamine, which Ms. Footman then sold. At the peak of Ms. Footman's dealing, Sarah fronted her 50 to 80 grams of fentanyl and two to three ounces of methamphetamine at a time. Ms. Footman had an understanding with Sarah as to how much she owed for the drugs Sarah fronted. On one occasion, Ms. Footman observed Sarah counting $180,000 in cash, secured by rubber bands.

Ms. Footman also shared an understanding with Sarah about the coded language Ms. Footman used in text messages to ask for more drugs. Text messages between Ms. Footman and Sarah corroborate Ms. Footman's testimony. *See* Gov't Ex. 79B.

Ms. Footman overheard Sarah talking about the people who supplied her with methamphetamine and fentanyl. Sarah referred to her suppliers using a racial slur and mentioned a person named Chinx. Ms. Footman stopped purchasing drugs from Sarah when Ms. Footman was arrested on July 8, 2021.

## C.  John Miller

John Miller supplied methamphetamine and fentanyl on behalf of Danielle and Sarah McBreairty in the Caribou area in Aroostook County. Tommy Hammond, who lived near Mr. Miller, introduced Mr. Miller to Danielle. Mr. Miller began dealing for Danielle at some point after 2019. When Danielle was arrested in August 2020, Mr. Hammond asked Mr. Miller for money to bail Danielle out. Mr. Miller contributed approximately $30,000 that he had obtained from selling narcotics to help bail her out.

After Danielle's arrest, Mr. Hammond introduced Mr. Miller to Sarah, and Mr. Miller began sourcing drugs from Sarah to sell. Sarah fronted the drugs to him. Sometimes Mr. Miller picked the drugs up directly from Sarah in Bangor and sometimes Sarah engaged other people, such as Mr. Footman, to transport the drugs to Mr. Miller in Aroostook County. Mr. Miller accumulated over $100,000 of debt to Sarah.

During the time Mr. Miller was dealing for Danielle and Sarah McBreairty, he also purchased handguns and gave the guns to Danielle and Sarah. When Mr. Miller was in debt to Sarah, he gave her six or seven handguns to pay off the debt he owed her for drugs; the Court finds those guns were traded as part of the drug conspiracy.

On May 20, 2021, Mr. Miller texted Sarah "Hey" to which she replied, "if ya can bring any toys that would be great." Gov't Ex. 79B at 20. "Toys" is slang for firearms. On June 1, 2021, Sarah texted Mr. Miller again, saying, "I do need them toys if you still have them.. I need them like yesterday.." Gov't Ex. 79B at 44. Mr. Miller responded, "OK Let me see what I can do in my car ride and I'll explain it to you when I get down there." Three hours later, Mr. Miller asked for an address, and Sarah sent her address at 91 5th Street, Bangor. Gov't Ex. 79B at 49.

When Mr. Miller was in jail after pleading guilty in this case, he met Mr. Corbett, who offered to pay for a lawyer for Mr. Miller.

### D. Joshua Young

Joshua Young grew up in Presque Isle, Maine, another town in Aroostook County. He moved away temporarily but returned to Presque Isle in December 2018. At the time he returned, he was addicted to heroin and alcohol and began buying his narcotics from Tommy Hammond. Mr. Hammond told Mr. Young that Danielle McBreairty supplied him.

23

When Mr. Young had been buying from Mr. Hammond for four to six months, Mr. Hammond was arrested, and Mr. Young began purchasing fentanyl from Danielle directly. Danielle fronted to Mr. Young approximately 50 grams of fentanyl at a time, once per week.

After Danielle was arrested in August 2020, Mr. Young briefly bought fentanyl from another dealer before moving on to purchase drugs from Sarah McBreairty. At first, Mr. Young bought fentanyl directly from Sarah, but eventually purchased through Mr. Miller. Mr. Young sometimes also delivered drugs on Sarah's behalf. On at least ten occasions, Mr. Young delivered fentanyl he had received from Sarah in Bangor to Mr. Miller in Aroostook County and delivered money from Mr. Miller to Sarah in return. Mr. Young also delivered firearms from Mr. Miller to Sarah McBreairty to help pay off Mr. Miller's debt.

### E.  Aaron Rodgers

Aaron Rodgers sold narcotics with Danielle and Sarah McBreairty. Danielle fronted methamphetamine and fentanyl to Mr. Rodgers until her arrest in August 2020. At the peak of Mr. Rodgers's dealing with Danielle, she fronted him 20 to 30 grams of fentanyl and one or two ounces of methamphetamine at a time, once or twice per week. Mr. Rodgers heard Danielle refer to her supplier as Chinx.

After Danielle was arrested in August 2020, Mr. Rodgers began buying drugs from Sarah McBreairty. Sarah fronted to Mr. Rodgers slightly lower quantities of fentanyl and methamphetamine—20 grams of fentanyl and one ounce of methamphetamine, once every week or two. Mr. Rodgers also heard Sarah refer to her supplier as Chinx. Sarah told Mr. Rodgers she didn't know Chinx's real name.

24

Mr. Rodgers was arrested on August 1, 2021, and has been incarcerated since then. Mr. Rodgers met Mr. Corbett for the first time while in jail. Mr. Corbett asked him whether he knew "this crazy girl Danielle." Mr. Rodgers said that he knew Danielle and Mr. Corbett claimed to have never met her.

### F.  Joshua Jerrell

Joshua Jerrell sold narcotics with Danielle and Sarah McBreairty. He moved to Maine in 2019. Danielle first gave Mr. Jerrell methamphetamine at her house in Glenburn, Maine, where she fronted him a half pound of methamphetamine. Mr. Jerrell sold the drugs Danielle supplied him to customers across Bangor and Brewer, Maine.

Mr. Jerrell later met Sarah on the dating app Tinder and began a romantic relationship with her. The first time they met in person, Mr. Jerrell went to Sarah's house, and they used methamphetamine Sarah supplied. Sarah told Mr. Jerrell she got the drugs from her sister. Sarah told Mr. Jerrell that she was her sister's bookkeeper.

Mr. Jerrell continued dealing methamphetamine for Danielle while dating Sarah. Danielle offered to front him fentanyl in addition to methamphetamine, but he declined. On one occasion, Mr. Jerrell helped Danielle count money from drug proceeds—Mr. Jerrell estimated they counted $500,000 to $1 million that day. Danielle told Mr. Jerrell she would give the money to "her people . . . down south."

After Danielle was arrested in August 2020, Mr. Jerrell went with Sarah to Danielle's house to recover at least $50,000 in cash that Danielle had hidden there.[25] Soon after, he overheard Sarah on the phone with Mr. Corbett discussing bailing Danielle out

---

[25] Mr. Jerrell testified it was $100,000. Others testified that it was only $50,000.

of jail. Sarah gave Mr. Jerrell $10,000 of the cash she and Mr. Jerrell took from Danielle's house and used the rest to buy drugs from Mr. Corbett.

Sarah continued to buy drugs from Mr. Corbett on other occasions after Danielle was arrested. Sarah told Mr. Jerrell she got her drugs from Chinx. Mr. Jerrell saw the drugs Sarah purchased from Mr. Corbett and estimated Sarah received ten pounds of methamphetamine and 1,000 grams of fentanyl at a time. He also dealt those drugs alongside Sarah. At Sarah's behest, Mr. Jerrell transported drugs to James Valiante and Mr. Jerrell also saw Mr. Valiante come to Sarah's house.

On June 1, 2021, Sarah asked Mr. Jerrell to purchase three firearms: one for Sarah, one for Mr. Jerrell, and one for Mr. Corbett. Mr. Jerrell was ultimately unable to purchase the firearms because his background check failed.

In January 2022, Mr. Jerrell and Sarah[26] were stopped by police in Newport, Maine. The police discovered methamphetamine and fentanyl in the vehicle, along with various paraphernalia such as spoons and scales that are indicative of the drug trade. *See* Gov't Ex. 65.

## CONCLUSIONS OF LAW

Defendants Corbett and Jackson were charged in Count One of the Indictment with conspiring to distribute and possess with intent to distribute 50 grams or more of methamphetamine and 500 grams or more of a substance containing methamphetamine and 400 grams or more of a substance containing fentanyl from January 1, 2018, to December 31, 2021, in the District of Maine, in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1), (b)(1)(A)(vi), (b)(1)(A)(viii).

---

[26] At the time, Mr. Jerrell was not supposed to have contact with Sarah due to a state court order.

## I.    Conspiracy

In order to prove the conspiracy, the Government must prove three elements beyond a reasonable doubt: "(1) [T]he existence of a conspiracy, (2) [each] defendant's knowledge of the conspiracy, and (3) [each] defendant's knowing and voluntary participation in the conspiracy." *United States v. Guzman-Ortiz*, 975 F.3d 43, 47 (1st Cir. 2020) (quoting *United States v. Paz-Alvarez*, 799 F.3d 12, 21 (1st Cir. 2015)).

"A criminal conspiracy is an agreement between two or more persons to accomplish an unlawful purpose." *United States v. Dellosantos*, 649 F.3d 109, 115 (1st Cir. 2011). "[I]f, 'on the evidence adduced at trial, a reasonable jury could find more than one such illicit agreement, or could find an agreement different from the one charged,'" the Court must consider whether multiple conspiracies existed, thereby varying from the charged conspiracy. *United States v. Brandon*, 17 F.3d 409, 449 (1st Cir. 1994) (quoting *United States v. Boylan*, 898 F.2d 230, 243 (1st Cir. 1990)); *Dellosantos*, 649 F.3d at 116 ("A variance occurs when the crime charged remains unaltered, but the evidence adduced at trial proves different facts than those alleged in the indictment." (quoting *United States v. Mangual–Santiago*, 562 F.3d 411, 421 (1st Cir. 2009))).

"In determining whether the evidence supports the existence of a single conspiracy, [courts] ultimately look at the totality of the evidence" and consider three factors: "(1) [T]he existence of a common goal, (2) interdependence among participants, and (3) overlap among the participants." *Dellosantos*, 649 F.3d at 117 (quoting *Mangual-Santiago*, 562 F.3d at 421). The second factor has sometimes been formulated as "the interdependence of various elements in the overall plan." *United States v. Franco-Santiago*, 681 F.3d 1, 8 (1st Cir. 2012), *abrogated on other grounds by Musacchio v. United States*, 577 U.S. 237 (2016). Therefore, the Court cannot convict unless it finds

beyond a reasonable doubt that "the conspiracy specified in the indictment, and not some other agreement or agreements, existed at or about the time or times specified in the indictment." *United States v. Bedini*, 861 F.3d 10, 17 (1st Cir. 2017). The Government must go beyond proving that "some type of conspiracy existed, even one involving some of the same alleged conspirators. The proof, rather, must persuade [the Court] that the conspiracy proved is in fact the one alleged in the indictment." *Id.*

To find Defendants knowingly and voluntarily participated in the conspiracy, "the evidence must establish that [each] defendant both intended to join the conspiracy and intended to effectuate the objects of the conspiracy." *Guzman-Ortiz*, 975 F.3d at 47 (quoting *Paz-Alvarez*, 799 F.3d at 21). That is, "the government must prove two kinds of intent: 'intent to agree and intent to commit the substantive offense.'" *Id.* (quoting *United States v. Gomez-Pabon*, 911 F.2d 847, 853 (1st Cir. 1990)). "Due to the clandestine nature of criminal conspiracies, the law recognizes that the illegal agreement may be either 'express or tacit' and that a 'common purpose and plan may be inferred from a development and collocation of circumstances.'" *United States v. Sanchez*, 917 F.2d 607, 610 (1st Cir. 1990) (quoting *United States v. Rivera-Santiago*, 872 F.2d 1073, 1079 (1st Cir. 1989).

Intent to "commit the substantive offense" can be satisfied by "intent to effectuate an underlying substantive offense." *United States v. Piper*, 35 F.3d 611, 613 (1st Cir. 1994). A defendant's mere association with co-conspirators or knowledge of illegal activity does not prove the defendant participated in the conspiracy. "[I]t is therefore essential to determine what kind of agreement or understanding existed as to each defendant." *Dellosantos*, 649 F.3d at 115 (quoting *Rivera–Santiago*, 872 F.2d at 1079).

28

In a drug conspiracy, "[s]howing that the defendant had knowledge of generalized illegality is insufficient; the Government must show that the defendant knew the conspiracy involved a controlled substance, but need not show that the defendant knew the specific controlled substance being distributed." *United States v. Burgos*, 703 F.3d 1, 10 (1st Cir. 2012) (citations omitted). "[E]ven a single sale for resale, embroidered with evidence suggesting a joint undertaking between buyer and seller, could suffice." *United States v. Gomes*, 376 F.3d 42, 45 (1st Cir. 2004) (quoting *United States v. Moran*, 984 F.2d 1299, 1303 (1st Cir. 1993)).

Based on the factual findings above, the Court concludes beyond a reasonable doubt that a single conspiracy to distribute methamphetamine and fentanyl in Maine existed between 2018 and 2021, that both Mr. Corbett and Mr. Jackson knew of the conspiracy, and that both Mr. Corbett and Mr. Jackson knowingly and voluntarily participated in the conspiracy.

### A. A Single Conspiracy Existed

The co-conspirators participated in a single conspiracy. Mr. Corbett and Mr. Jackson shared the common goal of distributing illegal narcotics—specifically fentanyl and methamphetamine[27]—with their co-conspirators. *United States v. Portela*, 167 F.3d

---

[27] "[T]he identification of a substance as a drug may be based upon the opinion of a knowledgeable lay person," such as a drug user whose experience with illicit drugs renders them competent to identify those drugs based on the drugs' effect. *United States v. Ocean*, 904 F.3d 25, 39 (1st Cir. 2018). The Court can also rely on circumstantial evidence such as the substance's price being consistent with the going rate for the drug. *United States v. Walters*, 904 F.2d 765, 771 (1st Cir. 1990). Here, the Court finds the following co-conspirator witnesses competent to identify fentanyl or methamphetamine based on their individual experiences as drug users and their testimony regarding the drugs' effects: Nikolas Raines, Shelby Loring, Sarah McBreairty, Justin Warman, Carol Gordon, James Valiante, Blaine Footman, Nicole Footman, Joshua Young, Aaron Rodgers, and Joshua Jerrell. The Court finds the testimony of those witnesses credible and finds they accurately identified the drugs Mr. Corbett and Mr. Jackson distributed to them.

687, 695 (1st Cir. 1999) ("That each defendant had an interest in furthering the distribution of cocaine is also sufficient evidence that they shared a common goal with the other participants.").

The participants in the conspiracy were interdependent. Co-conspirators depended on Mr. Corbett and Mr. Jackson to supply unlawful drugs. *See Mangual-Santiago*, 562 F.3d at 422 (finding interdependence where drug distributors relied upon a central supplier to obtain the cocaine they sold). For example, Sarah McBreairty sold— and distributed to other co-conspirators to sell—at least $1 million of methamphetamine (at $10,000 per pound) and $1.5 million of fentanyl (at $5,000 per 100 grams) that Mr. Corbett supplied to her from late August or early September 2020 until a few months before Sarah's arrest in February 2022. James Valiante purchased the fentanyl and methamphetamine he used from both Mr. Corbett and Sarah, who was supplied by Mr. Corbett. Nikolas Raines, Shelby Loring, and Justin Warman regularly asked Mr. Corbett and Mr. Jackson to supply them with fentanyl, methamphetamine, or both to sell. Ms. Loring also expressed her "loyalty" to Mr. Jackson as her supplier. Carol Gordon agreed to allow Mr. Corbett and Mr. Jackson to sell drugs including methamphetamine out of Ms. Gordon's apartment in exchange for Mr. Corbett supplying her with crack. Other co-conspirators, including Blaine and Nicole Footman, John Miller, Joshua Young, Aaron Rodgers, and Joshua Jerrell purchased narcotics from dealers, such as Danielle and Sarah, supplied by Mr. Corbett and Mr. Jackson.

---

John Miller did not personally use fentanyl or methamphetamine. Nonetheless, the Court finds Mr. Miller accurately identified the drugs he bought and sold based on the testimony of Sarah McBreairty (who sold the drugs to Mr. Miller) and Blaine Footman and Joshua Young (who purchased the drugs from Mr. Miller).

The Court similarly considers the credible corroborating testimony of law enforcement officers who identified based on their experience drugs seized from co-conspirators as methamphetamine and fentanyl.

Mr. Corbett and Mr. Jackson depended on co-conspirators to further sell the drugs they supplied for cash. *See Mangual-Santiago*, 562 F.3d at 422 (finding interdependence where a central drug supplier relied "upon the distributors . . . to sell the cocaine for cash"). Sarah McBreairty paid Mr. Corbett in stacks and bundles of cash for the fentanyl and methamphetamine he supplied to her to distribute. Sarah further distributed those drugs to co-conspirators in the greater Bangor and Aroostook County areas. Those co-conspirators, including Mr. Miller, Mr. Jerrell, Mr. Rodgers, Mr. Valiante, Mr. Footman, Ms. Footman, and Mr. Young used the drugs and sold the drugs to customers.

When Wayne Smith stopped paying Mr. Corbett for the drugs Mr. Smith had been distributing on Mr. Corbett's behalf, Mr. Corbett asked Ms. Loring to distribute drugs on Mr. Corbett's behalf instead. Mr. Corbett and Mr. Jackson sold to Ms. Loring, Sarah, and Danielle on "front," meaning Mr. Corbett and Mr. Jackson would provide the drugs, and Ms. Loring, Sarah, and Danielle would pay Mr. Corbett and Mr. Jackson back after selling the drugs. These dealers similarly fronted the drugs to other co-conspirators, all in exchange for cash.[28]

Mr. Corbett and Mr. Jackson depended on each other to effectuate the conspiracy. The evidence shows Mr. Corbett and Mr. Jackson worked together extensively to distribute fentanyl and methamphetamine. Together, Mr. Corbett and Mr. Jackson sold drugs including methamphetamine out of Ms. Gordon's apartment. Sometimes, when Mr. Warman texted Mr. Corbett to ask for drugs, Mr. Jackson would provide the drugs instead. When Mr. Raines bought drugs from Mr. Jackson, Mr. Raines would reach out to Mr. Corbett directly to resolve any problems. Furthermore, Ms. Loring sometimes used

---

[28] John Miller also paid some of his debt from fronting with guns.

the name Chinx to refer to both Mr. Corbett and Mr. Jackson together. During the walled-off stop on September 12, 2022, Mr. Corbett and Mr. Jackson were apprehended together in a vehicle, which had been tracked using Mr. Corbett's cell phone, with approximately $57,000 in cash inside the vehicle.

The participants in the conspiracy overlapped. Mr. Corbett and Mr. Jackson worked together when selling methamphetamine and fentanyl. Mr. Corbett and Mr. Jackson sold methamphetamine and fentanyl directly to several co-conspirators including Mr. Raines, Ms. Loring, Danielle, Sarah, Mr. Warman, Ms. Gordon, and Mr. Valiante. Those co-conspirators further distributed the drugs Mr. Corbett and Mr. Jackson supplied to co-conspirators including Mr. Footman, Ms. Footman, Mr. Miller, Mr. Young, Mr. Rodgers, and Mr. Jerrell.

Therefore, considering the totality of the evidence including the findings described above, the Court finds beyond a reasonable doubt that a single conspiracy, and not multiple conspiracies, existed to distribute fentanyl and methamphetamine in Maine from 2018 through 2021.

### B. Mr. Corbett and Mr. Jackson Knew of the Conspiracy

The Court finds Mr. Corbett and Mr. Jackson knew of the conspiracy. As described above, Mr. Corbett played a central role in the conspiracy. Mr. Corbett sold methamphetamine or fentanyl multiple times directly to numerous co-conspirators. For several months during the conspiracy, Mr. Corbett sold drugs with Mr. Jackson from a single location—Ms. Gordon's apartment—where Mr. Corbett instructed Ms. Gordon on how to handle visitors who arrived to purchase drugs. In 2020, Mr. Corbett was present with co-conspirators Mr. Jackson, Ms. Loring, and Mr. Raines in the Sanford Street

"Shoes Off" apartment where Mr. Corbett and Mr. Jackson dealt drugs—and where Ms. Loring, Mr. Raines, Mr. Warman, and Mr. Valiante purchased drugs.

As described above, Mr. Jackson also played a central role in the conspiracy. Mr. Jackson sold methamphetamine or fentanyl multiple times directly to numerous co-conspirators. For several months during the conspiracy, Mr. Jackson sold drugs with Mr. Corbett from a single location—Ms. Gordon's apartment—where Mr. Jackson arranged to have Tamara Davis deliver two kilograms of methamphetamine. In 2020, Mr. Jackson was present with co-conspirators Mr. Corbett, Ms. Loring, and Mr. Raines in the Sanford Street "Shoes Off" apartment where Mr. Jackson and Mr. Corbett dealt drugs—and where Ms. Loring, Mr. Raines, Mr. Warman, and Mr. Valiante purchased drugs.

### C. Mr. Corbett and Mr. Jackson Participated Voluntarily in the Conspiracy

The Court finds Mr. Corbett and Mr. Jackson each knowingly and voluntarily participated in the conspiracy. To that end, the Court finds Mr. Corbett and Mr. Jackson each intended to join the conspiracy and intended to effectuate the substantive offense of distribution and possession with intent to distribute of fentanyl and methamphetamine.

Mr. Corbett intended to join the conspiracy and intended to effectuate the distribution and possession with intent to distribute of fentanyl and methamphetamine. As the Court found above, Mr. Corbett sold fentanyl and methamphetamine directly to numerous co-conspirators. He also distributed massive quantities of drugs to co-conspirators like Sarah to further sell. He expected co-conspirators to whom he distributed fentanyl and methamphetamine to further distribute the drugs, indicated by the fact that he supplied those co-conspirators with quantities far exceeding reasonable

personal use on front. He expected those co-conspirators to repay him after further selling the drugs to customers.

Mr. Corbett sold drugs with Mr. Jackson at the "Shoes Off" Sanford Street apartment where multiple co-conspirators purchased drugs. He introduced Ms. Loring and Mr. Warman to Mr. Jackson, who also sold drugs. He also formed explicit and implicit agreements with co-conspirators regarding various aspects of the conspiracy. For example, he explicitly agreed with Ms. Gordon to give her crack in exchange for Ms. Gordon allowing Mr. Corbett to sell drugs, including methamphetamine, from her apartment. He came to an implicit agreement with both Ms. Loring and Sarah when he "fronted' them fentanyl and methamphetamine to sell, thereby agreeing to be paid for the supply after Mr. Loring and Sarah further distributed it.

Mr. Jackson also intended to join the conspiracy and intended to effectuate the distribution and possession with intent to distribute of fentanyl and methamphetamine. As the Court found above, Mr. Jackson sold fentanyl and methamphetamine directly to numerous co-conspirators. Mr. Jackson sold drugs with Mr. Corbett at the "Shoes Off" Sanford Street apartment where multiple co-conspirators purchased drugs. When dealing drugs at Sanford Street or at Ms. Gordon's apartment on 1st Street, Mr. Jackson personally handed over drugs to co-conspirators, including Ms. Loring and Mr. Warman, on behalf of Mr. Corbett. When Mr. Raines bought drugs from Mr. Jackson, Mr. Raines would reach out to Mr. Corbett directly to resolve any problems he had with Mr. Jackson. Mr. Jackson met Ms. Loring and Mr. Warman through Mr. Corbett. Mr. Jackson also arranged for Ms. Davis to deliver two pounds of methamphetamine from Rhode Island to Ms. Gordon's 1st Street apartment, from where he and Mr. Corbett distributed drugs.

34

Because both Mr. Corbett and Mr. Jackson intended to join the conspiracy and intended to effectuate the substantive offense of possession and distribution of fentanyl and methamphetamine, the Court finds beyond a reasonable doubt Mr. Corbett and Mr. Jackson each knowingly and voluntarily participated in the conspiracy.

Therefore, because the conspiracy charged in the Indictment existed, Mr. Corbett and Mr. Jackson each knew of the conspiracy, and Mr. Corbett and Mr. Jackson each knowingly and voluntarily participated in the conspiracy, the Court finds beyond a reasonable doubt Mr. Corbett and Mr. Jackson are each guilty of conspiring to possess and distribute fentanyl and methamphetamine.

## II.    Drug Quantity

For the purposes of sentencing calculations the Court must find beyond a reasonable doubt whether each Defendant knowingly or intentionally conspired to distribute methamphetamine or fentanyl "in a conspiracy that involved a total" of 50 grams or more of methamphetamine, 500 grams or more of a mixture containing methamphetamine, or 400 grams or more of a mixture containing fentanyl, "where at least [those same quantities] were foreseeable to the defendant."[29] *United States v. Pizarro*, 772 F.3d 284, 293–94 (1st Cir. 2014) (citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Alleyne v. United States*, 570 U.S. 99 (2013); and *United States v. Colon-Solis*, 354 F.3d 101 (1st Cir. 2004)). "[T]he conspiracy-wide quantity . . . governs the statutory maximum, [and] the individualized quantity, i.e., the quantity that is

---

[29] Though the Indictment charges the drug quantities in the conjunctive, because 21 U.S.C. § 841(b)(1)(A) is framed in the disjunctive the Government need only prove one of the charged quantities for the penalty provisions to apply. *United States v. Torres-Colon*, 790 F.3d 26, 34 (1st Cir. 2015).

foreseeable to the defendant, . . . triggers the mandatory minimum." *Pizarro*, 772 F.3d at 293.

Based on the facts described above, the Court finds beyond a reasonable doubt the charged conspiracy involved a total of 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers. The Court also finds beyond a reasonable doubt the charged conspiracy involved a total of 400 grams or more of a mixture or substance containing a detectable amount of fentanyl.

The Court finds beyond a reasonable doubt the following drug quantities attributable or foreseeable to each Defendant:

First, the Court finds 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers are attributable or reasonably foreseeable to Mr. Corbett.

Second, the Court finds 400 grams or more of a mixture or substance containing a detectable amount of fentanyl are attributable or reasonably foreseeable to Mr. Corbett.

Third, the Court finds 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers are attributable or reasonably foreseeable to Mr. Jackson.

Fourth, the Court finds 400 grams or more of a mixture or substance containing a detectable amount of fentanyl are attributable or reasonably foreseeable to Mr. Jackson.

The Government did not present evidence concerning the chemical purity of the methamphetamine. Therefore, the Court cannot find the conspiracy involved a total of 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers. For the

same reason, the Court cannot find 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers are attributable to either Mr. Corbett or Mr. Jackson.

## CONCLUSION

In view of the foregoing findings of fact and conclusions of law, the Court finds beyond a reasonable doubt that Defendants Daquan Corbett and Daviston Jackson are guilty of Count One, conspiracy to distribute 500 grams or more of a substance containing methamphetamine, and 400 grams or more of a substance containing fentanyl, from January 1, 2018, to December 31, 2021, in the District of Maine, in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1), (b)(1)(A)(vi), (b)(1)(A)(viii).

So Ordered.

Dated this 21st day of January, 2025.

/s/ Stacey D. Neumann
U.S. District Judge